[No. G040600. Fourth Dist., Div. Three. May 20, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
HUY NGOC NGUYEN, Defendant and Appellant.

COUNSEL

William J. Kopeny for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Gil Gonzalez and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**IKOLA, J.**—A jury convicted defendant Huy Ngoc Nguyen of forcible rape (count 1) (Pen. Code, § 261, subd. (a)(2))[1] and committing a lewd act on a child under age 14 (count 2) (§ 288, subd. (a)). The jury also found true defendant committed sex offenses against more than one victim. (§ 667.61, subds. (b), (e)(5).) The court sentenced defendant to a total term of 30 years to life, comprised of two consecutive terms of 15 years to life. Defendant contends that (1) under section 784.7, subdivision (a), the court erroneously ruled count 2 could be tried in Orange County even though the offense was committed in San Bernardino County; (2) the court erroneously admitted evidence of uncharged conduct; (3) his trial counsel rendered ineffective assistance; and (4) he was prejudiced separately by the foregoing errors and cumulatively by their combination.

We hold that section 784.7, subdivision (a), permits the joinder of any combination of its listed sex crimes, but requires the court to hold a section 954 joinder hearing at which the court may exercise discretion to deny joinder "in the interests of justice and for good cause shown." Here, the court did not abuse its discretion in permitting the San Bernardino offense to be joined with an Orange County offense for trial in Orange County. We further hold that although the court erroneously admitted evidence of uncharged nonsexual conduct under the purported authority of Evidence Code section 1108, the error was harmless. We also reject defendant's claims of ineffective assistance of counsel and cumulative error. Accordingly, we affirm the judgment.

FACTS

At defendant's trial in 2008, the court admitted evidence, under Evidence Code section 1108, of defendant's uncharged conduct that took place in 1987

---

[1] All statutory references are to the Penal Code unless otherwise stated.

through 1991 and for which defendant has never been tried or punished. We divide our factual recitation between defendant's charged offenses and uncharged conduct.

*Charged Offenses*

1. *Count 2—Lewd Act on New Year's Eve 1996*

At the time she testified in defendant's trial, A.T. was a 24-year-old social worker. On New Year's Eve of 1996, when A.T. was 13 years old, she went on a camping trip to Big Bear with a Vietnamese community organization and stayed in a two-story cabin with about 30 or 40 people, including defendant. Defendant was a close friend of A.T.'s family and an active member of the community. A.T. "looked up to him as a big brother."

A.T. did not drink any alcohol that night. After the New Year's Eve countdown and celebration, everyone sat down in the living room with the lights off and started telling scary stories. There were about 20 to 25 people in the room. A.T. was sitting next to defendant on the floor leaning against a couch, with people sitting next to and in front of them (about one to four feet away) and two people on the couch behind them. Defendant placed a blanket over A.T. and himself. "He started rubbing [her] arms, and then he started rubbing [her] feet and just moving up [her] legs. . . . [A.T.] didn't know what to do or think. And then he got to [her] jeans, and he unzipped [her] jeans and he put his hand in there." He rubbed her vaginal area over her underpants. She used both her hands to try to remove his hand, but he "was too strong." She did not say "anything to stop it." She "just sat there crying, trying to pull [his hand] out." This went on for 10 or 15 minutes. He finally stopped when someone turned on the lights.

Before that day, defendant had always been "very touchy with [A.T.], holding hands, hugging" her. Once, when A.T. was around 12, defendant gave someone a ride home from his office and A.T. drove with him. "After he dropped that person home, he drove [A.T.] into his neighborhood, parked the car, unfastened [her] seat belt and tried to kiss" her, but she refused.

Around three months after the Big Bear incident, defendant apologized to A.T. About two years after the molestation, A.T. told her sister, Tammy, about it. When A.T. was in her second year of college, she and her best friend were "training to be . . . sexual crisis counselor[s]." A.T. became inspired to report the Big Bear incident, so she and her friend "went to the Westminster Police Department and attempted to file a report." A.T. was told she would have to file her report in Big Bear. She did not do so. But, in 2004, A.T. was contacted by an Orange County Sheriff's investigator.

### 2. *Count 1—Forcible Rape in February 2004*

In 2002 or 2003, L.T. met defendant on a jet skiing trip. She told him she would be planning a group skydiving trip when she turned 18; he said he was interested and gave her his phone number.

In February 2004, when L.T. was a 17-year-old high school student, she saw defendant at the Tet Festival. She had phoned him prior to this second meeting. He invited her on a date and they went out to dinner and a movie that night.

After the movie, he asked if she wanted to go to his printshop to see a minimotorcycle. Around 10:00 p.m. or later, they entered the dark printshop. He told her to sit on a couch; there, he started kissing her. She was "really scared." "He said that it wasn't going to go any further, and [she] just kind of sat there and let him kiss [her]. And then he started unbuckling his pants, and that's when [she] used [her] hands just a little bit. [¶] And he said there's nothing that is going to happen. He said that [they] were just going to kiss. [¶] And [she] just kind of laid there and cried." Twice she said, "No." She was a virgin.

He started to take off her pants and she "froze." He touched her vagina. He put his penis in her vagina. It hurt and she told him so. At some point, he finished. He gave her a towel, they put their clothes on, and he drove her back to her car. He said he would call her.

L.T. drove around, phoning her friend, Mike Vu, but he did not answer his phone. Finally, Mike answered. They met and she "told him what happened." He told her she should "report it, but [she] didn't want to." She did not want her parents to know and to react by being overprotective of her younger sisters.

She "felt sore for a couple [of] days." A few days later a friend took L.T. to a clinic where L.T. told the nurse she'd been raped. Her vagina was examined and then she talked with a counselor. The pelvic examination revealed "a small mucosal tear on the right labia"; her internal exam was normal. The nurse practitioner testified that "[i]t takes a lot of force to tear even a young person."

L.T. told another friend about the rape. The friend told his girlfriend, Tammy. L.T. had a conversation with Tammy "that convinced [L.T.] to go to the police." L.T. went to the police station with Tammy and reported the incident. Shortly before filing the police report, L.T. learned that defendant was engaged to someone else.

At the request of a police detective, L.T. made a covert phone call to defendant. During the call, defendant told L.T. not to think or talk about "that night" and to "[j]ust keep it for a souvenir." L.T. stated she had cried that night, and that defendant had said he "wouldn't do it." Defendant replied, "That's true." "I tried not to do it." L.T. recalled slapping and stopping his hands. Defendant said, "[S]ometimes things get—get out of hand." He promised, "Next time I will control it," and added, "Just call that a night to remember."

*Uncharged Conduct with T.V.*[2]

At the time T.V. testified in defendant's trial, she was age 37, married with two children, and had a master's degree in business administration.

In 1987, when T.V. was a 17-year-old high school student, she began dating defendant (who was an adult adviser in T.V.'s high school organization). T.V.'s parents did not allow her to date at that time so she did not tell them about it. Defendant told T.V. he was 21 years old. (Defendant is actually only one year older than T.V.) At that time, defendant was "really nice," "had a great sense of humor," seemed kind, and stated he was attracted to T.V. because she "was a good Catholic girl . . . ."

Defendant was T.V.'s boyfriend for four years. For the first few months, they dated and were not intimate. Then T.V. confided in defendant that she had been molested when she was a girl by a boarder in her home, but she was still a virgin. Soon after that, she and defendant had sex, even though she was not ready and did not believe in premarital sex. She cried and he said he was sorry.

Defendant seemed "a little obsessive," took actions that confused and scared T.V., and would get jealous about "the simplest things." He "seemed to know what was going on with [her], even when [he wasn't] there," as though he had a spy. Defendant "was really strong," had a black belt in martial arts, and had been a lightweight wrestler in high school. Once he forced her to sit by him in church by grabbing her breast and threatening to "grab [her] breast in front of everyone" if she did not comply.

T.V. tried to break up with defendant, but "he would say he couldn't live without [her] and that he would kill himself or something like that." Once "he took half a bottle of . . . jumbo-sized aspirin" in front of her and "got really, really sick." He would say he wanted to marry her. She would "resolv[e] to try to make it work with him."

---

[2] For brevity and to avoid confusion, we sometimes refer to witnesses by their first names. We mean no disrespect.

T.V. confided in Travis (her future husband) her concerns about her relationship with defendant and leaving the relationship. Travis and T.V. were leaders in the church Scouts. Travis asked T.V. out, but she "told him [she] had a boyfriend and . . . just wanted to be friends" with Travis. Travis replied he understood, but he loved her and could not pretend to be simply her friend.

T.V. was then attending California State Polytechnic University, Pomona (Cal Poly Pomona). One day during her first month of college, she told Travis she really needed to talk with him, so Travis drove to campus and they talked for several hours in his parked car about her relationship with defendant. They drove to a store, then back to campus. Defendant was there, standing by T.V.'s car. T.V. told Travis, "No matter what happens, no matter what I do, just go home." She told Travis that defendant would never hurt her, but he might hurt Travis.

T.V. and Travis got out of Travis's car. Defendant did "a high kick" at Travis's neck, which Travis blocked with both his hands. To "create a distraction," T.V. ran down the parking lot. Defendant followed her, calling out her name. Travis, meanwhile, followed T.V.'s instructions and drove home.

Defendant grabbed T.V. and "kept saying, 'Why, why? Why are you doing this?' " She "pushed away from him, . . . broke off running again, [and] got into [her] car and . . . locked the door." She fumbled to turn on the engine. Suddenly, he "casually" approached with a key and opened the car door. She was "shocked" since she had never given him a key. Angry, defendant kept saying "Why?" "He punched the car window and just shattered" or cracked it. "He took [her] to his truck [and] drove [her] back to his house." At his house, he raped her. He was angry and the rape was "very painful." She "kept crying . . . and he kept saying, how could [she] have done this to him."

T.V. did not realize "there was such a thing as being raped by a boyfriend." On many occasions (nine to 11 times), defendant forced T.V. to have sex with him, "usually after some argument, some fight." Once, he took photographs of her naked, which she felt he would use against her and her family if she "got away from him." The only time T.V. ever had consensual sex with defendant was the very first time they had intercourse. Defendant never hit T.V.

A second encounter occurred between defendant and Travis. Travis and T.V. were at a church teaching some Girl Scouts to dance, when defendant "showed up." T.V. had no idea how defendant knew she and Travis were there. Defendant "came up to Travis in front of all the kids and he punched him in the face with something metallic. [T.V.] was thinking maybe he was wearing brass knuckles . . . , but Travis told [her] later he thought maybe it was his keys . . . ." "Travis didn't do anything" because he did not want to fight in front of the children. Defendant told Travis he (defendant) was going to take T.V. with him. T.V. told Travis she wanted to go with defendant because she was afraid, not wanting "a confrontation in front of the kids [or] Travis to get hurt."

Defendant took her to a nearby motel. "Really angry," he made her watch "a porn video," then said he had told Travis that he (defendant) "was going to take [T.V.] to a motel and fuck [her]." Defendant forced T.V. to have sex with him. "It was probably one of the worst times because he was very angry, . . . trying to ram into [her] really, really hard because he was so angry."

In another incident, defendant phoned T.V. at night and said he needed to come to her house and talk with her. They had been arguing and she refused to see him. He said if she "didn't come out, he was going to come into the house." T.V. phoned 911 and reported the incident and that her "boyfriend was stalking" her. The "911 operator told [her] to stay on the line," and that a man was outside her house staring at it, but a nearby police unit could not "do anything" unless he tried to break and enter. T.V. heard noises like someone being "slammed against a garage door" and the police saying, "Put your hands up." The 911 operator said the man had tried to climb over the fence into T.V.'s backyard. T.V. told a detective she did not want to prosecute defendant for rape because "it would be shameful to [her] family" and he was her boyfriend so she "didn't know if that was normal."

Feeling she was not "emotionally strong enough to get away from him if he could find" her, T.V. moved to San Jose where she stayed with distant relatives. But she told family and friends she was going to Texas so defendant could not find her. Her parents, who felt she had shamed the family, made her come back once "mid year to go to church so that people wouldn't think [she] left because [she] got pregnant . . . ."

Years later, when T.V. saw a Los Angeles Times newspaper article about defendant's arrest, she contacted the district attorney's office because she felt guilty that she had allowed another woman to be raped.

Travis corroborated T.V.'s account of the incident at the Cal Poly Pomona parking lot and her description of the incident at church.

*Defense*

Defendant introduced the parties' stipulations that (1) A.T. told an investigator that she tried to report the incident when she was 18 years old, but failed to tell the investigator that anyone accompanied her to the Westminster Police Department, and (2) the Westminster Police Department has "no written record of a report being made by [A.T.] regarding the alleged incident."

## DISCUSSION

*Trial of Count 2 in Orange County*

Prior to trial, defendant moved to sever and dismiss count 2 on the basis that its trial in Orange County would violate section 784.7 and his constitutional vicinage rights.[3] The court denied the motion.[4] Defendant contends the court's ruling prejudiced him, increasing his sentence to two consecutive terms of 15 years to life.[5]

Under subdivision (a) of section 784.7 (section 784.7(a)), "[w]hen more than one violation of [certain specified sex crimes] occurs in more than one" county, the offenses may be tried in a single county, subject to the court holding a section 954 hearing where the prosecution presents written evidence that all district attorneys of the jurisdictional counties agree to the

[3] The People contend defendant "forfeited his constitutional argument because he did not renew it when he moved to sever the charges." In fact, defendant's written motion alleged an Orange County trial of count 2 would violate his vicinage rights.

[4] Defendant also argues on appeal that because sections 777 and 691 provide that the jurisdiction for a crime is the county in which it occurred, the error is jurisdictional. But the Supreme Court, in *Price v. Superior Court* (2001) 25 Cal.4th 1046 [108 Cal.Rptr.2d 409, 25 P.3d 618] (*Price*), made clear that these sections relate to venue, which "is not an aspect of the fundamental subject matter jurisdiction of the court and does not affect the power of a court to try a case." (*Id.* at p. 1055.)

[5] If a defendant is convicted of two sexual crimes against separate victims in one trial, the court must sentence the defendant to 15 years to life for each conviction, if the crimes are specified in subdivision (c) of section 667.61. (§ 667.61, subds. (b), (e)(5).) Section 667.61, subdivision (c)'s enumerated crimes include rape under section 261, subdivision (a)(2) and lewd acts under section 288, subdivision (b). (§ 667.61, subd. (c)(1) & (8).) The court must impose a consecutive sentence for each such offense under section 667.61, subdivision (i), or section 667.6, subdivision (d) (where, as here, the crimes predate the enactment of § 667.61, subd. (i)).

venue.[6] Under section 954 (which governs joinder of crimes committed in the same county), "[a]n accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes . . . ." Section 954 further provides that a court, "in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately . . . ."

The Legislature amended section 784.7 in 2002. Prior to the 2002 amendment, the statute required that the defendant and the victim be "the same for all of the offenses" in order for the crimes to be joined.[7] The 2002 amendment divided the former single-paragraph statute into subdivisions (a) and (b); grouped all sex crimes into subdivision (a); and added two sexual assault crimes to subdivision (a)'s list of sexual offenses. The amendment deleted the same defendant/victim requirement for subdivision (a) sexual offenses, but maintained it for the subdivision (b) crimes of willfully harming a child, willfully inflicting corporal injury, and stalking.

The parties advocate opposing interpretations of section 784.7(a). By its terms, section 784.7(a) allows trial in a single county "[w]hen more than one violation of Section 220 . . . , 261, 262, 264.1, 269, 286, 288, 288a, 288.5, *or* 289 occurs in more than one jurisdictional territory . . . ." (Italics added.) Defendant interprets this language to permit joinder of two or more *identical* sex crimes, i.e., offenses predicated on the same statute, such as section 261 for rape. In his view, the statute does not authorize joinder of two nonidentical sex crimes, such as the combination here of a section 261 rape and a

---

[6] Section 784.7 provides: "(a) When more than one violation of Section 220 [(assault with intent to commit sex crime or mayhem)], except assault with intent to commit mayhem, 261 [(rape)], 262 [(rape of spouse)], 264.1 [(rape or penetration with foreign object in concert)], 269 [(aggravated sexual assault of child)], 286 [(sodomy)], 288 [(lewd acts)], 288a [(oral copulation)], 288.5 [(continuous sexual abuse of child)], or 289 [(forcible sexual penetration] occurs in more than one jurisdictional territory, the jurisdiction of any of those offenses, and for any offenses properly joinable with that offense, is in any jurisdiction where at least one of the offenses occurred, subject to a hearing, pursuant to Section 954, within the jurisdiction of the proposed trial. At the Section 954 hearing, the prosecution shall present evidence in writing that all district attorneys in counties with jurisdiction of the offenses agree to the venue. Charged offenses from jurisdictions where there is no written agreement from the district attorney shall be returned to that jurisdiction. [¶] (b) When more than one violation of Section 273a [(willful harm to child)], 273.5 [(willful infliction of corporal injury)], or 646.9 [(stalking)] occurs in more than one jurisdictional territory, and the defendant and the victim are the same for all of the offenses, the jurisdiction of any of those offenses and for any offenses properly joinable with that offense, is in any jurisdiction where at least one of the offenses occurred."

[7] Former section 784.7 provided: "When more than one violation of Section 261, 262, 264.1, 273a, 273.5, 286, 288, 288a, 288.5, 289, or 646.9 occurs in more than one jurisdictional territory, and the defendant and the victim are the same for all of the offenses, the jurisdiction of any of those offenses is in any jurisdiction where at least one of the offenses occurred."

section 288 lewd act. The People argue the statutory language permits joinder of any combination of the listed crimes. They stress that sexual offenses belong to the same class of crimes for purposes of section 954 (a point we discuss in more detail below).

In an alternative argument, defendant contends that if section 784.7 permits joinder of nonidentical crimes (as the People advocate), then the statute's application here violated his vicinage rights under the California Constitution because no reasonable nexus existed between Orange County and the commission of count 2, as mandated by *Price, supra*, 25 Cal.4th 1046.[8] He argues counts 1 and 2 have "no common victims, no common violations of a statute, no contemporary time frame, and no common course of conduct," with one crime involving a child molestation of a 13 year old and the other a date rape eight years later of a 17 year old.

In *Price, supra*, 25 Cal.4th 1046, our Supreme Court held *former* section 784.7 did not violate the defendant's vicinage rights under either the Sixth Amendment to the United States Constitution or article I, section 16 of the California Constitution. (*Price*, at p. 1050.) " '[V]icinage refers to the area from which the jury pool is drawn.' " (*Id.* at p. 1054.) *Price* explained that the "Legislature has made section 784.7 an exception to the general venue statute," and that "the Legislature may determine the venue for trial except to the extent the vicinage or due process provisions of the state or federal Constitution circumscribe that authority." (*Id.* at p. 1056.) As to the federal Constitution, *Price* concluded that, "[b]ecause the history of the Fourteenth Amendment does not indicate an intent to incorporate the vicinage clause of the Sixth Amendment, and vicinage today is not a fundamental aspect of the right to jury trial necessary to ensure a fair trial, . . . the vicinage clause is not applicable in a state criminal trial."[9] (25 Cal.4th at p. 1069.) As to the state Constitution, *Price* stated: "[T]he right to a trial by a jury of the vicinage, as guaranteed by the California Constitution, is not violated by trial in a county having a reasonable relationship to the offense or to other crimes committed by the defendant against the same victim. We do not hold here that a crime may be tried anywhere. The Legislature's power to designate the place for trial of a criminal offense is limited by the requirement that there be a reasonable relationship or nexus between the place designated for trial and the commission of the offense. Repeated abuse of the same child or spouse in more than one county creates that nexus. [¶] The venue authorized by section 784.7 is not arbitrary. It is reasonable for the Legislature to conclude that this

---

[8] We note both defendant and A.T. were Orange County residents at the time of the commission of count 2.

[9] Defendant recognizes we are bound by *Price*'s holding that "the vicinage clause of the Sixth Amendment is not applicable to the states through the Fourteenth Amendment" (*Price, supra*, 25 Cal.4th at p. 1065), but asserts his Sixth Amendment argument to preserve it.

pattern of conduct is akin to a continuing offense and to conclude that the victim and other witnesses should not be burdened with having to testify in multiple trials in different counties." (*Id.* at p. 1075.) Thus, *Price* grounded former section 784.7's constitutionality on the requirement that the joined crimes have been committed against the same victim.

The proper interpretation, and consequent constitutionality, of current section 784.7(a) appear to be issues of first impression where all crimes joined pursuant to current or former section 784.7 were *nonidentical*.[10] For example, *Price* involved two charges of child endangerment, committed by the defendant in separate counties (along with murder and torture counts joined under § 954). (*Price, supra,* 25 Cal.4th at p. 1051.) Similarly, the recent case of *People v. Acosta* (2009) 176 Cal.App.4th 472 [98 Cal.Rptr.3d 92] involved two charges of lewd acts on a minor, committed in separate counties and tried together under section 784.7(a). In *Roman Catholic Archbishop of Los Angeles v. Superior Court* (2005) 131 Cal.App.4th 417 [32 Cal.Rptr.3d 209], however, an appellate court in dictum appeared to broadly construe the current statute to permit nonidentical sex crimes committed in separate counties to be tried together: Section 784.7(a), "allows a sex crime committed outside Los Angeles County to be joined with a Los Angeles County sex crime, and then for the entire case to be prosecuted in Los Angeles County." (*Roman Catholic Archbishop of Los Angeles*, at p. 461.)

■ We turn to our threshold undertaking—to interpret section 784.7(a). We construe the statute de novo. (*Harustak v. Wilkins* (2000) 84 Cal.App.4th 208, 212 [100 Cal.Rptr.2d 718].) "In independently construing a statute, we strive to ascertain the lawmakers' intent 'so as to effectuate the purpose of the statute.' [Citation.] We look first to the 'plain meaning' of the statute's words, and only if the language is ambiguous do we resort to extrinsic aids . . . ." (*Miller v. Collectors Universe, Inc.* (2008) 159 Cal.App.4th 988, 999 [72 Cal.Rptr.3d 194] (*Miller*).) Extrinsic aids include "the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy . . . , and the statutory scheme of which the statute is a part." (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1008 [239 Cal.Rptr. 656, 741 P.2d 154].) "Where possible, we construe the statute 'so as to avoid absurd or unreasonable results . . .'" (*Miller*, at p. 999) and to "'avoid[] serious constitutional questions'" (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1357 [63 Cal.Rptr.3d 483, 163 P.3d 160]).

---

[10] In *People v. Delgado* (2010) 181 Cal.App.4th 839 [104 Cal.Rptr.3d 495], we held section 784.7 passed constitutional muster where the identical crime was committed against separate victims in different counties.

Despite each party's assertion that the statutory language is clear, it is ambiguous, susceptible of both their interpretations. To construe it, we consider the original purpose of section 784.7, the legislative history of the 2002 amendment, the statutory scheme as a whole, and the statute's potential for absurd results or constitutional infirmity.

"Section 784.7 was enacted to protect repeat victims of child abuse or molestation and victims of domestic violence, offenses that are often inflicted on the same victim by the same perpetrator, from the need to make multiple court appearances to testify against the perpetrator and to reduce costs of separate trials." (*Price, supra*, 25 Cal.4th at p. 1055.)

The 2002 amendment "recast and broaden[ed the] provision" by adding assault crimes "to the list of sexual offenses that can be used to prove that a defendant . . . has the predisposition to commit such offenses" and by allowing "one trial for victims of a serial rapist/assault." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 2252 (2001–2002 Reg. Sess.) as amended May 15, 2002, pp. D, F.)[11] As to the elimination of "the same defendant/same victim requirement in cases involving multiple sex crimes," the legislative history reflects the purpose of the change was "to limit the number of court appearances for victims in serial sexual assault cases occurring in multiple counties." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 2252 (2001–2002 Reg. Sess.) as amended May 15, 2002, p. G.) "The sponsor states if a defendant is charged with multiple sex crimes involving different victims in a number of different counties, the ability to introduce propensity evidence pursuant to Evidence Code section 1108 virtually ensures that multiple victims will testify in any county that chooses to prosecute the defendant. Thus, if a defendant raped different victims in San Mateo, Santa Clara and San Francisco, a prosecutor in Santa Clara would charge the defendant with committing rape and most likely introduce evidence of the other rapes . . . ." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 2252 (2001–2002 Reg. Sess.) as amended May 15, 2002, p. G.)

A legislative committee report identified a potential constitutional weakness in the 2002 amendment: "As discussed above, the California Supreme Court [in *Price*] commented that the Legislature's power to designate the place for trial of a criminal offense is limited by the requirement that there be a reasonable relationship or nexus between the place designated for trial and

---

[11] At the People's request, we take judicial notice, pursuant to Evidence Code section 452, subdivision (c), of the legislative history of the 2002 amendment of section 784.7.

the commission of the offense. The Court upheld the validity of Penal Code section 784.7 by holding that the repeated abuse of the same child or spouse in more than one county created that nexus. The sponsors of this bill contend that the unique difficulties experienced by victims of sexual assault who must testify in court justify a departure from traditional venue and vicinage requirements." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 2252 (2001–2002 Reg. Sess.) as amended May 15, 2002, p. H.) "The author and sponsor submit this provision is intended to address cases of serial rape/sexual assault. As currently drafted, this bill could be applied more broadly than cases of serial rape." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 2252 (2001–2002 Reg. Sess.) as amended May 15, 2002, p. J.) "Penal Code section 790 provides that jurisdiction for any charged murder shall be in any county that has jurisdiction for murder for one or more murders charged in a single complaint or indictment 'as long as the charged murders are connected together in their commission,' as specified. The Committee may wish to consider requiring that the consolidation this bill would authorize for serial sex offenses likewise require that the cases be connected together to show some common purpose, scheme or modus operandi. However, imposing such a requirement may exclude many rape cases where the rape itself, although committed against more than one victim, is done in wholly different circumstances every time. In conversations with staff counsel, the sponsor submits the bill's existing cross-reference to section 954 is intended to ensure that the joinder of offenses contemplated by this bill would be appropriate and subject to court review, and that to require a connection such as that in section 790 would result in the exclusion of many of the cases they are trying to reach." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 2252 (2001–2002 Reg. Sess.) as amended May 15, 2002 p. J.)

Sections 954 and 784.7 are part of the same statutory scheme in that section 954 regulates intrajurisdictional joinder and section 784.7 governs interjurisdictional joinder. Under section 784.7(a), interjurisdictional joinder is "subject to" a section 954 hearing at which the prosecution presents evidence that other district attorneys have agreed to the venue. Although section 784.7(a)'s language is not crystal clear on this issue, its mandate of a section 954 hearing and its use of the phrase "subject to" indicates that interjurisdictional joinder under section 784.7(a) is allowed only if section 954 permits joinder of the charges.

■ As part of the relevant statutory scheme, section 954 is significant to our interpretation of section 784.7(a) in two respects. First, section 954 permits joinder of "offenses of the same class of crimes." Sex offenses "belong to the same class of crimes." (*People v. Lindsay* (1964) 227 Cal.App.2d 482, 492 [38 Cal.Rptr. 755] ["rape, sex perversion and sodomy clearly belong to the same class of crimes . . ." because the "intent to satisfy

sexual desires runs through" them]; see also *People v. Ross* (1960) 178 Cal.App.2d 801, 805 [3 Cal.Rptr. 170] [common attribute bringing offenses into same class of crimes was that each act was a sex crime committed against a child].) Thus, section 954 permits joinder of sex crimes, thereby supporting the People's interpretation of section 784.7(a) as allowing the joinder of nonidentical sex crimes committed in different counties.

■ Second, section 954, by granting a court the discretion to sever offenses "in the interests of justice and for good cause shown," is critical to the constitutional validity of section 784.7(a), which no longer requires offenses to have been committed against a single victim. As our Supreme Court has explained with respect to Evidence Code section 1108, a trial court's discretion to exclude unduly prejudicial evidence provides a "realistic safeguard" of a defendant's due process and equal protection rights (*People v. Falsetta* (1999) 21 Cal.4th 903, 918 [89 Cal.Rptr.2d 847, 986 P.2d 182] (*Falsetta*)) and shields the defendant from " 'a fundamentally unfair trial' " (*id.* at p. 917). So, too, a court assessing the propriety of joinder under section 784.7 must consider the prejudicial effects of such joinder upon a good showing made by a party resisting it.

Construing section 784.7(a) to permit joinder of nonidentical sex crimes is consistent with the Legislature's desire to protect victims of sexual offenses from having to testify in multiple trials and counties and to minimize judicial costs. Although the Legislature sought to protect "victims of a serial rapist/assault," a serial sex offender may be predisposed to commit more than one of the sex crimes listed in section 784.7(a). Conversely, a type of offense, such as rape, can be committed by a defendant against separate victims in entirely different circumstances, as occurred in *People v. Harris* (1998) 60 Cal.App.4th 727 [70 Cal.Rptr.2d 689] (*Harris*), where the trial court prejudicially admitted evidence of a prior rape under Evidence Code section 1108. (*Harris*, at p. 730.) There, the defendant violently and brutally raped a stranger, leaving her unconscious and bloodied, 23 years before allegedly raping his former patient with whom he had previously shared consensual sex. The *Harris* defendant could arguably be branded a serial rapist, even though these rapes under section 261 were markedly dissimilar.

Defendant's interpretation of section 784.7(a) as only permitting joinder of identical sex offenses does not ensure the statute's constitutionality. As seen in *Harris*, a reasonable relationship does not necessarily exist between two distinct commissions of an identical crime. Furthermore, limiting section 784.7(a) joinder to a defendant's multiple commissions of an identical offense would permit absurd results, e.g., nonjoinder when a defendant rapes a victim within the meaning of section 261, then immediately drives her across a county line and rapes her with a foreign object within the meaning of section

289. In such a case, interjurisdictional joinder would be unavailable for "two or more different offenses connected together in their commission" that would have been joinable under section 954 absent the crossing of the county line.

█ In sum, section 784.7(a) permits the joinder of any combination of its listed sex crimes, but requires the court to hold a section 954 hearing at which the court may exercise discretion to deny joinder "in the interests of justice and for good cause shown."

█ But we must still consider whether the court abused its discretion by denying defendant's section 954 motion. "Because a severance motion lies within the discretion of the trial judge, denial of the motion will be disturbed on appeal only for abuse of discretion resulting in substantial prejudice to the defendant." (*People v. Matson* (1974) 13 Cal.3d 35, 39 [117 Cal.Rptr. 664, 528 P.2d 752].) When section 954's requirements for joinder are plainly met and the defendant seeks severance in the interest of justice and for good cause shown, the defendant must " 'clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' " (*Frank v. Superior Court* (1989) 48 Cal.3d 632, 640 [257 Cal.Rptr. 550, 770 P.2d 1119].)

█ At the pretrial hearing on defendant's motion to sever and dismiss count 2, defendant made no effort to show prejudice. Judge Thomas Borris focused on the proper construction of section 784.7. Defendant argued there was "no nexus between these two offenses" and "no serial-type activity here." The People countered the nexus was "that it is a sexual assault crime" and the victim's testimony would have been introduced as Evidence Code section 1108 evidence even absent joinder. The court denied defendant's section 954 motion to sever and dismiss count 2.

In doing so, the court did not abuse its discretion. Defendant failed to show he would be prejudiced by the combined trial of counts 1 and 2. (*Frank v. Superior Court, supra*, 48 Cal.3d 632, 640 [defendant seeking severance must "clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried"].)

*Admissibility of Uncharged Conduct Under Section 1108*

Prior to trial, the court conducted an Evidence Code section 352 analysis and ruled the testimony of T.V. and Travis was admissible under Evidence Code section 1108. Defendant contends the court's ruling prejudicially deprived him "of due process and a fair trial by admitting, over objection, evidence of uncharged, unadjudicated, remote, inflammatory prior crimes."

Defendant claims the evidence "alleged that 20 [to] 21 years before the trial, [he] engaged in over two dozen crimes, including non-sexual crimes of violence, assault, theft, stalking, and abduction, as well as dissimilar crimes of rape by coercion, and intimidation of another person."[12]

Under Evidence Code section 1101, character evidence is inadmissible when offered to prove a defendant's "conduct on a specified occasion," with the exception of "evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as . . . intent, . . . plan, . . . absence of mistake or accident, or [lack of reasonable belief that a victim consented to an unlawful sexual act]) other than his or her disposition to commit such an act." (*Id.*, subds. (a), (b).)

■ "Because evidence of other crimes may be highly inflammatory, its admissibility should be scrutinized with great care." (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1007 [254 Cal.Rptr. 586, 766 P.2d 1].) One purpose of the general rule against the admission of propensity evidence is to "guard[] against undue prejudice" to the defendant. (*Falsetta, supra*, 21 Cal.4th at p. 916.) In this context, the word "prejudice" is used in the sense of " 'an emotional bias' " (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1315 [97 Cal.Rptr.2d 727] (*Jennings*)) or " ' "of 'prejudging' a person or cause on the basis of extraneous factors" ' " (*Harris, supra*, 60 Cal.App.4th at p. 737).

■ In sexual offense cases, Evidence Code section 1108 creates an exception to Evidence Code section 1101's prohibition against propensity evidence. Under Evidence Code section 1108, when a criminal defendant is accused of a sexual offense, "evidence of the defendant's commission of another sexual offense or offenses" is not excluded under section 1101 if not inadmissible under Evidence Code section 352.[13] (Evid. Code, § 1108,

---

[12] Defendant asserts the testimony of T.V. and Travis "provided the jury with evidence of the following crimes" he allegedly committed against them: (1) sexual assault, assault, false imprisonment, lewd acts on a minor (grabbing T.V.'s breast to force her to sit with him in church); (2) unlawful intercourse with a 17 year old (first act of intercourse); (3) rape by coercion (threatening to kill himself if she left him); (4) felonious assault "#1" (kicking Travis in parking lot at Cal Poly Pomona); (5) stalking, theft (appearing at Cal Poly Pomona parking lot when T.V. returned in the company of Travis, with T.V.'s car key in his possession); (6) auto tampering, malicious mischief (punching out T.V.'s car window); (7) abduction and rape by coercion (taking T.V. from Cal Poly Pomona to his house where he raped her); (8) multiple rapes over a three-to-four-year period (many instances); (9) production of child pornography (taking nude photos of T.V.); (10) felonious assault "#2" (the "brass knuckles" assault on Travis); (11) exhibiting pornography to a minor (forcing T.V. to view pornography); (12) rape (the forced sex at a motel); and (13) stalking (police arrested defendant outside T.V.'s house).

[13] "[T]he 'Legislature has determined that the policy considerations favoring the exclusion of evidence of uncharged sexual offenses are outweighed in criminal sexual offense cases by

subd. (a).) For purposes of Evidence Code section 1108, "sexual offense" includes sexual assault, lewd acts on a minor, unlawful intercourse with a minor, rape by coercion, forcible rape, production of child pornography, and exhibiting pornography to a minor. (*Id.*, subd. (d)(1)(A).) Section 1108's definition of "sexual offense" does *not* include simple assault, false imprisonment, felonious assault, stalking, theft, auto tampering, or malicious mischief. Our Supreme Court has held Evidence Code section 1108 to be constitutionally valid because "the provision preserves trial court discretion to exclude the evidence if its prejudicial effect outweighs its probative value . . ." under Evidence Code section 352. (*Falsetta, supra*, 21 Cal.4th at p. 907.)

Evidence Code section 352 gives a court the discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." A trial court's Evidence Code section 352 ruling is reviewed for abuse of discretion and will " 'not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125 [36 Cal.Rptr.2d 235, 885 P.2d 1].) "The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." (*Falsetta, supra*, 21 Cal.4th at p. 913.)

The factors to be considered by a trial court in conducting the Evidence Code section 352 weighing process depend upon "the unique facts and issues of each case . . . ." (*Jennings, supra*, 81 Cal.App.4th at p. 1314 [regarding propensity evidence of other domestic violence crimes under Evid. Code, § 1109].) "Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright

the policy considerations favoring the admission of such evidence. The Legislature has determined the need for this evidence is "critical" given the serious and secretive nature of sex crimes and the often resulting credibility contest at trial. . . .' [Citations.] [¶] Accordingly, when a defendant is charged with a sexual offense, evidence of his or her uncharged sexual misconduct is no longer subject to the general prohibition against character evidence. [Citation.] 'With the enactment of [Evidence Code] section 1108, the Legislature "declared that the willingness to commit a sexual offense is not common to most individuals; thus, evidence of any prior sexual offenses is particularly probative and necessary for determining the credibility of the witness." ' " (*People v. Yovanov* (1999) 69 Cal.App.4th 392, 403–404 [81 Cal.Rptr.2d 586], fn. omitted.)

admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta, supra,* 21 Cal.4th at p. 917.)

 Condensing this list, five factors stand out as particularly significant in an Evidence Code section 1108 case. These factors are (1) whether the propensity evidence has probative value, e.g., whether the uncharged conduct is similar enough to the charged behavior to tend to show the defendant did in fact commit the charged offense; (2) whether the propensity evidence is stronger and more inflammatory than evidence of the defendant's charged acts; (3) whether the uncharged conduct is remote or stale; (4) whether the propensity evidence is likely to confuse or distract the jurors from their main inquiry, e.g., whether the jury might be tempted to punish the defendant for his uncharged, unpunished conduct; and (5) whether admission of the propensity evidence will require an undue consumption of time. (*Harris, supra,* 60 Cal.App.4th at pp. 738–740.) A trial court balances this first factor, i.e., the propensity evidence's probative value, against the evidence's prejudicial and time-consuming effects, as measured by the second through fifth factors. (*People v. Branch* (2001) 91 Cal.App.4th 274, 282 [109 Cal.Rptr.2d 870].)

Here, at a pretrial hearing, defense counsel argued the People's proffered evidence involving T.V. and Travis was "substantially more egregious conduct, highly more inflammatory, highly more prejudicial" "compared to the two charged offenses," and that this propensity evidence included stalking, abuse, violence, continuous rapes, and "other people utilized to stalk." Defense counsel stated the jurors might feel "an instinct to punish" defendant for the uncharged offenses. She argued the evidence's probative value was minimal because defendant's relationship with T.V. was significantly different from his relationship "with the two charged victims."

The court conducted the Evidence Code section 352 "analysis set forth in *Harris*[, *supra,* 60 Cal.App.4th 727]." The court found the charged offenses and the uncharged conduct were similar because defendant developed a relationship with each victim through "community involvement, church, or whatever, and then gain[ed] the confidence of [the victim and used] that to accomplish a rape." The court further found the uncharged conduct was no more inflammatory than defendant's rape of L.T. explaining that while defendant allegedly raped T.V. more than once, this series of rapes made "them arguably less credible and perhaps consensual." Further, the court found no probability of confusion, reasoning that the jurors were more likely to "question . . . whether the [uncharged] conduct even occurred [and] whether it was consensual or not," rather than to conclude defendant escaped punishment. The court also stated it would give a limiting instruction on the use of Evidence Code section 1108 evidence.

On the "inadmissibility" side of the spectrum, the court found the uncharged conduct was remote. It also considered whether evidence of the uncharged conduct would require an undue consumption of time. In response to the court's query regarding the number of prosecution witnesses on the uncharged conduct, the prosecutor stated she would not call Travis as a witness unless T.V.'s credibility was attacked. The court requested an offer of proof regarding Travis's "involvement." The prosecutor described the incident where defendant "smash[ed]" the window of T.V.'s car, fought with Travis, and raped T.V. that evening, and the occasion where defendant "punched Travis in the face with some brass knuckles . . . in front of the children," "said into [Travis's] ear, 'I'm going to take her to a motel room and fuck her,' " and then took T.V. to a motel room and raped her. The court stated: "So that evidence may or may not come in, and I'm not ruling on that at all right now. It depends on what happens at trial." (Travis ultimately testified about the two assaults.) On the time-consumption factor, the court found the testimony of T.V. and Travis would not take an inordinate amount of time.

Having reviewed the relevant factors, the court concluded "the probative value of the evidence regarding T.V. outweighs the prejudicial effect as to both victims," and ruled the evidence was admissible under Evidence Code section 1108. In response to the court's query, the prosecutor stated she was offering the evidence exclusively under Evidence Code section 1108, *not* Evidence Code section 1101, subdivision (b).

On appeal, defendant argues the probative value of the propensity evidence is insubstantial because of "striking dissimilarities" between the uncharged conduct and the charged crimes, including their "significantly different nature and quality." He points out that not only was T.V. his girlfriend in an intimate relationship, but the uncharged conduct also involved felony assaults, stalking, pornography, theft, and threats to kill himself. Defendant contends the other four *Harris* factors "militate against admitting the [propensity evidence], and when considered together, these factors establish an abuse of discretion in admitting this evidence, and demonstrate that this is a case in which the defendant was deprived of a fair trial as a result of the admission of this evidence." He asserts the evidence is inflammatory as it involves violence, intimidation, abduction and other repulsive types of conduct not present in and more egregious than the charged crimes. He argues the jury may have wanted to punish him upon learning he was not convicted of rape for the uncharged conduct. He asserts the uncharged conduct was remote, occurring 13 to 17 years before his alleged rape of L.T. As to the undue consumption of time factor, he points out that the testimony of T.V. and Travis took up 64 pages in the reporter's transcript, compared to a total of 96 pages for the testimony of A.T. and L.T.

1. *The Court Did Not Abuse Its Discretion by Admitting Evidence of the Uncharged Sexual Conduct*

With regard to the admissibility of evidence of the uncharged sexual offenses involving defendant's relationship with T.V., the discretionary choice of the trial court to admit this evidence was a rather close call under Evidence Code section 352, particularly as it related to the offense charged in count 2. But the discretionary ruling will " 'not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Rodrigues, supra,* 8 Cal.4th at pp. 1124–1125.) That test has not been met here. As the prosecutor put it in closing argument: Defendant is "a man who can't take 'no' for an answer. That's who he is." The uncharged sexual offenses tended in reason to show that defendant indeed did have a propensity for not taking "no" for an answer, but instead made his sexual advances over the victims' protestations. The admission of this evidence was neither arbitrary, nor capricious, nor patently absurd.

2. *The Court Erred by Admitting Evidence of Uncharged Nonsexual Conduct Under Evidence Code Section 1108*

In their respondent's brief, the People fail to address the nonsexual nature of some of the propensity evidence, instead treating the uncharged conduct as though it consists entirely of defendant's alleged rapes of T.V. The nonsexual evidence erroneously admitted by the court solely under the purported authority of Evidence Code section 1108 includes defendant's two violent attacks on Travis, theft of T.V.'s car key, breaking the car's window, stalking T.V., and trying to break into her house. "Sexual offenses" made admissible by section 1108 are precisely defined by the statute. Defendant's nonsexual uncharged conduct is not within the statutory definition, and is thus inadmissible character evidence under section 1101, subdivision (a). The *Falsetta* court saved section 1108 from constitutional infirmity by, inter alia, assuming the trial court would exclude "irrelevant though inflammatory details surrounding the offense" as part of its "careful weighing process under section 352." (*Falsetta, supra,* 21 Cal.4th at p. 917.) That did not happen here. It is true that defendant's abusive relationship with T.V. may have contributed to her submission to defendant's sexual attacks. But her knowledge of defendant's other criminal acts, including his acts of violence, is not the sort of "fear of immediate and unlawful bodily injury on the person or another" required by section 261, subdivision (a)(2). In fairness to the trial

judge, who otherwise performed a thorough Evidence Code section 352 analysis, counsel did not seek to separate and exclude the nonsexual offenses from the sexual offenses. The court nevertheless was made aware of the nature of the evidence and should have excluded the nonsexual offenses as not admissible under Evidence Code section 1108.

### 3. *The Error in Admitting Evidence of Nonsexual Uncharged Conduct Was Harmless*

Absent a "miscarriage of justice," we may not reverse the judgment. (Cal. Const., art. VI, § 13.) The court's admission of the propensity evidence of nonsexual conduct did not prejudice defendant. The People's case was very strong as to count 1. L.T.'s testimony was supported by two witnesses, as well as transcripts and tapes of defendant's own words. As to count 2, A.T.'s testimony was corroborated in part by two witnesses and bore similarities to the offense against L.T. In each case, defendant used his position of trust, as a friend and leader in the Vietnamese community, to press his sexual advances against a minor woman. Furthermore, the court instructed the jury pursuant to CALCRIM No. 1191 that evidence of the uncharged conduct was insufficient to prove defendant guilty of the charged sex offenses and that the People were still required to "prove each element of rape by force and lewd act upon child under 14 years of age beyond a reasonable doubt." It is not "reasonably probable" the jury would have acquitted defendant even if all the propensity evidence of uncharged nonsexual conduct had been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; see *Harris, supra*, 60 Cal.App.4th at p. 741 [applying *Watson* standard].)

### *Ineffective Assistance of Counsel Related to Police Testimony*

Defendant asserts the People violated his Fifth and Sixth Amendment rights by eliciting an Orange County detective's testimony that defendant failed to show up for scheduled interviews, as well as the detective's opinion that defendant appeared "evasive" during an interview. Defendant argues this testimony "constituted comment on [his] exercise of his right to remain silent in the face of police questioning, and impermissible police officer opinion on whether or not [he] was being truthful." Defendant concludes his trial counsel rendered ineffective assistance by failing to object to this testimony. Under Evidence Code section 353, a reviewing court may not reverse a judgment for erroneous admission of evidence absent an objection of record.

As relevant to defendant's ineffective assistance claim, the detective testified as follows. The detective initially tried to contact defendant by phoning him at his place of business. The detective "tried several times and then wound up leaving a card eventually." At some point, the detective told defendant "he was a suspect in a crime and [the detective] needed to get his side of the story," then "set up a time" for defendant to meet with him. Defendant agreed to meet the detective at the sheriff's office, but never showed up for the meeting. On April 8, 2004, the detective arrived unannounced at defendant's printshop and interviewed him about L.T. (not A.T.).[14] In response to the prosecutor's question, "How would you describe the defendant's demeanor when he was talking to you?" The detective testified, "I would describe it as evasive." The detective made another appointment with defendant subsequent to the printshop interview, but defendant did not show up as promised.

In closing argument, the prosecutor did not mention defendant's missed appointments or the detective's attempts to contact defendant. The prosecutor did comment on the printshop interview, arguing defendant lied about his age and L.T.'s and that they did not have sex, and responded to the rape accusation by saying, " 'Well, I'm so tired.' "

 To prove an ineffective assistance claim, a defendant must show that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 692 [80 L.Ed.2d 674, 104 S.Ct. 2052] (*Strickland*).) A court need not "address both components of the inquiry if the defendant makes an insufficient showing on one." (*Id.* at p. 697.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Ibid.*)

To prove prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra,* 466 U.S. at p. 694.) "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." (*Id.* at p. 695.)

Here, defendant has failed to "carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." (*People v. Williams* (1988) 44 Cal.3d 883, 937 [245 Cal.Rptr. 336, 751 P.2d 395].) To the extent the detective's testimony

---

[14] The detective's first contact with A.T. noted in the record occurred on May 5, 2004.

suggested defendant was guilty or dishonest, the detective asked defendant only about *L.T.* at the printshop interview, and the two other scheduled meetings for which defendant did not show up were to talk with him about *L.T.* Thus, this testimony did not directly relate to the case concerning A.T. And the People's case on count 1, concerning L.T., was very strong, featuring defendant's admissions during the covert telephone conversation with L.T. To the extent the detective's testimony might have had a minimal overflow effect on the jury's findings concerning A.T., count 2 was supported by corroborative evidence and bore some similarity to count 1 as to defendant's avenue for gaining his victim's trust. The People's case on count 2 rested most essentially on the jury's determination of A.T.'s credibility. It is highly unlikely that an interview (or missed interviews) with defendant about the L.T. case would have an effect on the believability of A.T.'s testimony.

Moreover, the detective's testimony, in and of itself, was *not* of singular import. As to the evasiveness comment, the jurors heard the recorded printshop interview and could gauge for themselves whether defendant was forthcoming, as opposed to evasive. During the printshop interview, the detective himself suggested that another meeting would be futile, saying, "And tell me what? The same thing? That you didn't do it?" In contrast to *People v. Waldie* (2009) 173 Cal.App.4th 358, 363, 364 [92 Cal.Rptr.3d 688] (on which defendant relies), where the defendant failed to return an officer's phone calls "about a dozen times" prior to the defendant's arrest, here defendant missed only two scheduled meetings with the detective. In sum, the detective's testimony did not have sufficient impact to raise a "reasonable probability that, but for counsel's [failure to object], the result of the proceeding would have been different."[15] (*Strickland, supra,* 466 U.S. at p. 694.) The testimony does not undermine our confidence in the verdict.

*There Was No Cumulative Effect of Errors*

For the reasons discussed above, it is not reasonably probable that, absent the court's admission of nonsexual propensity evidence against defendant *and* his trial counsel's failure to object to the detective's testimony, the result in this case would have been different. (*People v. Watson, supra,* 46 Cal.2d at p. 836; *Strickland, supra,* 466 U.S. at p. 694.) The case on count 1 was *not* close. As to count 2, any errors were not serious enough, even considered together, to undermine our confidence in the outcome. (Compare with *People v. Hill* (1998) 17 Cal.4th 800, 847 [72 Cal.Rptr.2d 656, 952 P.2d 673] ["sheer number" of errors created "synergistic effect"]; 6 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Reversible Error, § 46, p. 508 [Numerous Errors With Cumulative Effect].)

---

[15] We express no opinion on whether defense trial counsel performed deficiently by failing to object to the detective's testimony.

## DISPOSITION

The judgment is affirmed.

Rylaarsdam, Acting P. J., and Aronson, J., concurred.

A petition for a rehearing was denied June 9, 2010, and appellant's petition for review by the Supreme Court was denied September 15, 2010, S184040.