Filed 4/15/14  P. v. Sinohue CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>EUGENE SINOHUE,<br><br>     Defendant and Appellant. | B237301<br><br>(Los Angeles County<br>Super. Ct. No. LA063843) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joseph A. Brandolino, Judge.  Affirmed in part, vacated in part, and remanded.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Nima Razfar, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Eugene Sinohue appeals from the judgment entered following a jury trial that resulted in his convictions for multiple counts of committing a lewd act with a child under the age of 14 and continuous sexual abuse of a child. The trial court sentenced Sinohue to a term of 30 years to life in prison.

Sinohue contends: the trial court erred by denying his Penal Code section 784.7 motion, refusing to excuse 20 jurors for cause, erroneously admitting evidence, and instructing the jury with CALCRIM No. 1193; his counsel performed ineffectively; a detective committed "witness tampering" in violation of his due process rights; and his sentence on count 5, pursuant to the "One Strike" law, violates ex post facto principles. As the People concede, the latter contention has merit. We accordingly vacate the sentence imposed on count 5, and remand for resentencing. In all other respects, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts.*

a. *People's evidence.*

(i) *Sexual molestation of J.K.*

Sinohue's second cousin was J.K., who was approximately 12 years old in June 1998. J.K. lived in San Mateo County, but he and his mother, Monique, and his younger sister would annually vacation in the Los Angeles area to visit family, including Sinohue. During a visit to Los Angeles in the summer of 1998, J.K. spent two weeks with Sinohue at Sinohue's condominium. During that visit, Sinohue and J.K. showered together and slept in the same bed. Sinohue gave J.K. massages, which began as nonsexual events but soon became sexual. He showed J.K. pornography, fondled his penis, coached him on how to ejaculate, rubbed his penis against J.K.'s buttocks, and placed his penis in J.K.'s anus.

J.K. returned home to San Mateo County. Shortly thereafter, Sinohue moved nearby to live with J.K.'s grandmother. Sinohue began taking care of J.K. and his sister almost every day, picking them up from school and babysitting them into the evenings while Monique attended graduate school. Between September 1998 and May 1999,

2

Sinohue molested J.K. approximately once or twice a week. His actions included massaging J.K., masturbating J.K., masturbating in front of J.K., and touching J.K.'s buttocks with his penis. Sinohue also gave J.K. a stack of pornographic magazines to peruse and showed him pornographic movies.

J.K. did not tell anyone about the molestation. He knew that Sinohue gave him things he would not otherwise have, including clothing and video games. Sinohue also took J.K. to lunch and dinners in restaurants. J.K. believed there was an understanding between them that Sinohue gave him such things as long as J.K. kept the molestation a secret.

Eventually Monique became concerned that Sinohue was a bad influence on J.K. In the spring of 1999 she told Sinohue she no longer wished him to babysit, because he was undermining her authority. She told Sinohue not to contact her children. Sinohue nonetheless kept in contact with J.K. via the internet. On one occasion, Sinohue flew his plane to San Mateo County, took J.K. miniature golfing in Lake Tahoe, and flew him back to San Mateo. In 2000, Monique caught J.K. on the computer instant messaging Sinohue. She threatened to obtain a restraining order against Sinohue and had her brother remove any software from the computer that would allow J.K. to contact Sinohue.

While working on the computer, Monique's brother discovered an email from Sinohue to J.K. It stated: " '[J.K.], I wish I could just ignore the situation you and I have. It would be the best way out, but I can't. At the same time, I don't want things to change. I like the relationship you and I have. I want it to continue and grow, but I can no longer pretend everything is exactly normal between us.' " Sinohue referenced "the things we do together," and stated: "You seem to enjoy them most times, and you even start them sometimes, while, at other times, I can definitely tell you are uncomfortable. I know I enjoy them, and what scares me the most about that is, I don't know what it says about me. I know I am not gay."

Upon reading the email, Monique asked J.K. if Sinohue had inappropriately touched him. J.K. denied it.

(ii) *Molestation of D.L. between 2008 and 2009.*

David L. and Lori L. had two sons, D.L. and Daniel. Lori's sister, Lisa B., was dating Sinohue, and David L. and Lori L. treated him like a close family member. D.L. and Daniel spent a great deal of time with Sinohue, visiting amusement parks, playing video and other games, and going on plane rides in Sinohue's plane. Sinohue made D.L. Halloween costumes, purchased him a cellular telephone and a flat screen television, and set up a Facebook account for him. When the boys spent the night at Sinohue's residence, D.L. slept in his and Lisa's bed. D.L. and Daniel also showered with Sinohue.

Sinohue began molesting D.L. in 2003 or 2004, when D.L. was six or seven years old. The molestation included sexual fondling, masturbation, oral copulation, and attempted anal penetration. Sinohue also showed D.L. pornography. He told D.L. these activities were "our secret" and that he would go to jail if D.L. told.

In the summer of 2004, Sinohue, Lisa, Lisa's longtime friend Heather P., and Heather's husband Michael P., went on a trip together to Cape Cod. Heather observed Sinohue's unusual behavior with D.L., including showering naked with him. Sinohue constantly wished to spend time with the boys, rather than with other adults. In 2007, Heather reported Sinohue's unusual behavior with the boys to the Department of Family Services. David L. and Lori L. indicated they felt nothing inappropriate had occurred and the matter was dropped.

In 2008 David L. and Lori L. began having marital problems. In 2009 they separated and began new relationships, David with B.T. and Lisa with Christopher B. B.T. and Christopher B. told them that Sinohue's behavior with the children was unusual. Other family members, including Lori and Lisa's mother, Barbara B., and Jodi B., D.L.'s godmother, also observed Sinohue's behavior with the boys and were concerned by it.

In the summer of 2009, the boys accompanied Lisa and Sinohue on a trip to Hawaii, where Sinohue continued sexual abuse of D.L.

D.L. did not report the molestation because, although he felt the touching was "weird," he loved Sinohue.

4

Eventually David L. and Lori L. began limiting Sinohue's contact with their sons. However, Sinohue continued to contact D.L. in defiance of their directives. In October 2009, David L. and Lori L. obtained a restraining order against Sinohue. Shortly thereafter, at a party at his house, he cried and told Jodi he could not live without the boys.

Increasingly suspicious, Jodi decided to talk with D.L. He admitted that Sinohue had orally copulated him. D.L. told Jodi he did not tell anyone because he was afraid and ashamed. D.L. repeated this information to Jodi's husband, Carl. Jodi sought advice from an attorney friend and a psychologist, and then reported the matter to police.

Around the same time, J.K. and his family visited Sinohue in Los Angeles. As a result, J.K. became acquainted with D.L. and Daniel and noticed that Sinohue was behaving with D.L. as he had with him. J.K. told Michael to keep his kids away from Sinohue. A month later he told Michael that Sinohue had molested him, but asked Michael to keep the information secret. J.K. told his mother of Sinohue's abuse after she observed Sinohue's suspicious conduct with D.L. Monique made a report to authorities.

(iii) *Investigation.*

Los Angeles Police Department (L.A.P.D.) Detective Angela Stewart investigated the case. D.L. initially described some inappropriate activities to her, and disclosed more in subsequent interviews. J.K. also told Stewart about Sinohue's sexual abuse of him.

Pursuant to a warrant, police searched Sinohue's residence and computers. That search disclosed a large quantity of pornographic images and videos on Sinohue's computer. Police additionally found several emails addressed to D.L., in which he stated he had suffered by being separated from D.L., and loved him. Police also found a slightly different version of the email to J.K. that Monique's brother had previously discovered. It stated that Sinohue wished J.K. was 16 and could make his own decisions. In a postscript, Sinohue stated, "You have no idea how badly I want to suck your cock." Police additionally discovered a letter or diary entry entitled " 'Where It All Began,' "

5

that described Sinohue's arousal after a two-year-old J.K. touched and put his mouth on Sinohue's penis.[1]

(iv) *Child Sexual Abuse Accommodation Syndrome expert's testimony.*

The People presented the testimony of an expert on Child Sexual Abuse Accommodation Syndrome (CSAAS).

b. *Defense evidence.*

Sinohue testified on his own behalf. He denied showing J.K. or D.L. pornography or inappropriately touching them. He never sent the email to J.K., and the "where it all began" letter was his attempt to work through his restrictive upbringing. He had refused J.K.'s request to recommend him for a job in the movie industry.

Lisa testified that she had dated Sinohue for eight years before becoming engaged to him. She and Sinohue acted as D.L. and Daniel's primary caretakers, and Sinohue was like their father. She denied observing any molestation.

The defense, like the People, presented the testimony of an expert on CSAAS.

2. *Procedure.*

Trial was by jury. Sinohue was convicted of three counts of committing a lewd act upon a child under the age of 14 (Pen. Code, § 288, subd. (a))[2] and two counts of continuous sexual abuse of a child under 14 (§ 288.5, subd. (a)). The jury further found that Sinohue had substantial sexual contact with the victims in all counts (§ 1203.066, subd. (a)(8)) and found true a multiple victim allegation (§ 667.61). As to the offenses against J.K. (counts 3, 4, and 5), the jury found Sinohue used obscene matter or matter depicting sexual conduct in commission of the offenses (§ 1203.066, subd. (a)(9)), and the offenses were committed when J.K. was under 18 and prosecution commenced prior to his 28th birthday (§ 801.1, subd. (a)). The trial court denied Sinohue's motion for a new trial and sentenced him to 30 years to life in prison. It imposed a restitution fine, a

---

[1]     The content of this letter is discussed in more detail, *post.*

[2]     All further undesignated statutory references are to the Penal Code.

6

suspended parole restitution fine, a court security fee, a criminal conviction assessment, and a sex offender fine. Sinohue appeals.

DISCUSSION

1. *Trial of count 5 in Los Angeles County did not violate section 784.7 or Sinohue's state or federal vicinage rights.*

Sinohue was charged in counts 3 and 4 with commission of a lewd act upon J.K. (§ 288, subd. (a)) occurring in Los Angeles County in 1998. He was charged in count 5 with the continuous sexual abuse of J.K. (§ 288.5, subd. (a)) occurring in San Mateo County between September 1, 1998 and June 30, 1999. Sinohue complains that trial of count 5 in Los Angeles County, rather than San Mateo County, violated section 784.7 and his constitutional vicinage rights, as well as his rights to due process and a fair trial. These contentions lack merit.

a. *Applicable legal principles.*

Section 777 provides the general rule for venue in criminal cases: when a crime is committed in a particular county, venue lies in that county.[3] (*People v. Aleem* (2006) 144 Cal.App.4th 1155, 1157; *People v. Federico* (2011) 191 Cal.App.4th 1418, 1425.) Section 784.7 provides an exception to this general rule by allowing prosecution of specified sex and domestic violence offenses in any county where any of the offenses occurred. (*People v. Delgado* (2010) 181 Cal.App.4th 839, 845-856; *People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1107-1108.) Section 784.7 provides in pertinent part: "(a) When more than one violation of [enumerated offenses, including sections 288 and 288.5] occurs in more than one jurisdictional territory, the jurisdiction of any of those offenses, and for any offenses properly joinable with that offense, is in any jurisdiction where at least one of the offenses occurred, subject to a hearing, pursuant to Section 954, within the jurisdiction of the proposed trial. At the Section 954 hearing, *the prosecution*

---

[3]    Section 777 provides in pertinent part: "except as otherwise provided by law the jurisdiction of every public offense is in any competent court within the jurisdictional territory of which it is committed."

7

*shall present evidence in writing that all district attorneys in counties with jurisdiction of the offenses agree to the venue.* Charged offenses from jurisdictions where there is no written agreement from the district attorney shall be returned to that jurisdiction." (Italics added.)

Section 954 governs joinder of criminal offenses. It provides that an accusatory pleading may charge two or more different offenses that are connected together in their commission, or that are of the same class of crime, but the trial court may, in the interests of justice, order the charges tried separately.

b. *Additional facts.*

Before trial, Sinohue filed a "Demand for a Hearing Pursuant to California Penal Code § 784.7," asking that the People produce "proper documentation permitting prosecution here for crimes allegedly committed outside this jurisdiction." In response the People presented a letter, dated January 28, 2011, addressed to Steve Cooley, the Los Angeles County District Attorney at the time, from the San Mateo District Attorney's Office. That letter stated: "At your request, we have reviewed investigative materials from the Los Angeles Police Department pertaining to Eugene Sinohue and an alleged violation of Penal Code Section 288.5 committed by him in the County of San Mateo upon minor victim [J.K.] [¶] Pursuant to Penal Code Section 784.7, I hereby agree that any such offenses that may have been committed in San Mateo County by defendant Eugene Sinohue involving the above referenced victim may be prosecuted in Los Angeles County." The letter was printed on the San Mateo District Attorney's Office letterhead, captioned "Stephen M. Wagstaffe, District Attorney/Public Administrator" and "County of San Mateo." The letterhead also bore the name of "Karen Guidotti, Chief Criminal Deputy." The letter's subject heading included Sinohue's date of birth, his Los Angeles County Superior Court case number, and the L.A.P.D. incident report number. The signature block read: "STEPHEN M. WAGSTAFFE, DISTRICT ATTORNEY, By Karen M. Guidotti, Chief Deputy," and bore Guidotti's signature.

Defense counsel argued, inter alia, that the letter was insufficient to establish agreement between the district attorneys as required by section 784.7 because it was not

8

personally signed by District Atty. Wagstaffe and did not bear District Atty. Cooley's signature. The trial court concluded the letter was sufficient to satisfy the requirements of section 784.7. It appeared authentic, referenced Sinohue's case number and birthdate, and provided sufficient evidence establishing that the district attorneys had agreed to trial of the charge in Los Angeles.[4]

c. *The trial court did not err by finding the San Mateo District Attorney's letter satisfied the evidentiary requirement of section 784.7.*

Sinohue complains the prosecution "failed to present evidence in writing establishing that the District Attorneys of San Mateo and Los Angeles Counties had agreed to allow the crime [to] be prosecuted in Los Angeles County," and therefore count 5 "should have been returned to San Mateo County" to be tried there. As he did below, Sinohue argues the letter presented by the People was insufficient to meet the requirements of section 784.7 because it was not personally signed by District Attys. Wagstaffe and Cooley. In Sinohue's view, section 784.7 "plainly states" that the prosecution must produce "a venue agreement" personally signed by the district attorneys of the affected jurisdictions. He posits that "district attorney," as used in section 784.7, means "the elected District Attorney of each county, not his or her 'office,' not his or her assistant, or the chief deputy, or a deputy district attorney." He contends there was no evidence Chief Deputy Guidotti "had the specific authority to bind the elected District

---

[4]     The information initially alleged, incorrectly, that Sinohue committed the continuous sexual abuse of J.K. alleged in count 5 in Los Angeles County. Accordingly, at the hearing on Sinohue's section 784.7 demand, the trial court found, as an alternative basis for its ruling, that section 784.7 did not apply because the conduct alleged in count 5 was a single, continuous offense that occurred in both counties and could have been charged in either. The following day, the People moved to amend the information to allege that the conduct in count 5 occurred in San Mateo County. The prosecutor explained that the dates of the offenses in the Los Angeles counts did not overlap with those alleged in count 5. The trial court allowed the amendment, but reasoned that its ruling regarding venue remained correct given that the People had provided the letter evidencing the district attorneys' agreement.

9

Attorney to a venue agreement," and complains that the letter failed to show the Los Angeles venue was authorized by District Atty. Cooley.

We uphold a trial court's determination on factual issues if supported by substantial evidence. (*People v. Betts* (2005) 34 Cal.4th 1039, 1055.) The plain language of section 784.7 does not impose the rigid, formalistic requirements Sinohue proposes. The statute provides only that "the prosecution shall present evidence in writing that all district attorneys in counties with jurisdiction of the offenses agree to the venue." (§ 784.7, subd. (a).) It does not require a "venue agreement" personally signed by each district attorney; it simply requires "evidence in writing." Evidence includes "writings . . . offered to prove the existence or nonexistence of a fact." (Evid. Code, § 140.) Thus, any writing tending to prove the agreement, not just a formal venue agreement, may be adequate if found sufficient by the trial court. *Delgado,* cited by Sinohue, does not assist him. In *Delgado,* the district attorney filed a " 'Written Venue Agreement' " pursuant to section 784.7. (*People v. Delgado, supra,* 181 Cal.App.4th at p. 844.) *Delgado* did not hold such a formalized document was required in order to comply with section 784.7. Indeed, *Delgado* did not have occasion to discuss what type of evidence is sufficient to prove an agreement under section 784.7. Cases are not authority for propositions not considered. (*People v. Brown* (2012) 54 Cal.4th 314, 330; *People v. Moore* (2012) 211 Cal.App.4th 1179, 1189.)

Here, the letter produced by the People provided evidence both district attorneys agreed to the Los Angeles venue. The letter expressly stated that the San Mateo County District Attorney agreed to the Los Angeles venue. Sinohue's theory that the district attorneys of each jurisdiction must *personally* sign documents evidencing agreement is untenable. Section 784.7 does not contain such a requirement. In support of his theory, Sinohue points out that a district attorney is an elected official, who is solely responsible for the charging function in criminal cases. (*Gananian v. Wagstaffe* (2011) 199 Cal.App.4th 1532, 1542-1543 [district attorney of each county independently exercises discretionary powers in the initiation and conduct of criminal proceedings]; Gov. Code,

10

§ 26500 [the district attorney "shall attend the courts, and within his or her discretion shall initiate and conduct on behalf of the people all prosecutions for public offenses"].)

These points are accurate, but provide no support for the notion that the district attorney must *personally* sign a document evidencing a venue agreement. A district attorney frequently acts through his or her deputies. Here, the letter was signed by District Atty. Wagstaffe's chief deputy, under Wagstaffe's name. Sinohue does not dispute that the letter was authentic or that Guidotti was Wagstaffe's chief deputy. A signature is "presumed to be . . . authorized if it purports to be the signature, affixed in his official capacity, of: [¶] . . . [¶] (b) A public employee of any public entity in the United States." (Evid. Code, § 1453.) Moreover, "[i]t is presumed that official duty has been regularly performed." (Evid. Code, § 664.) Under these circumstances, Guidotti's signature, affixed in her official capacity as Chief Deputy of the San Mateo District Attorney's Office, on a letter stating District Atty. Wagstaffe agreed to the Los Angeles venue, furnished sufficient evidence of the San Mateo County District Attorney's agreement.

Although the letter was not signed by District Atty. Cooley or his representative, his agreement can be reasonably and logically inferred from it. The letter states it was sent in response to District Atty. Cooley's request to review the case. Prosecution on count 5 was commenced in Los Angeles County Superior Court. From these facts, the trial court could reasonably infer District Atty. Cooley agreed to the Los Angeles venue for count 5. Indeed, any other conclusion would be nonsensical. The purpose of section 784.7 is to permit offenses occurring in different counties to be consolidated so that a victim may be spared having to testify in multiple trials in different counties. (*People v. Nguyen, supra,* 184 Cal.App.4th at p. 1113; *People v. Betts, supra,* 34 Cal.4th at p. 1059; *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1055; *People v. Aleem, supra,* 144 Cal.App.4th at p. 1159 & fn. 8.) Section 784.7 is to be construed liberally. (*Price*, at p. 1055.) The legislative purpose would not be furthered by imposing the evidentiary requirements suggested by Sinohue. The trial court correctly found the People presented

11

sufficient written evidence to establish the district attorneys in the affected counties agreed to the Los Angeles venue for count 5.

d. *Trial of count 5 in Los Angeles County did not violate Sinohue's vicinage rights.*

Sinohue further argues that apart from the question of venue, trial of count 5 in Los Angeles County violated his vicinage rights under the federal and California Constitutions, that is, his right to have the charges against him decided by a jury drawn from San Mateo County, not Los Angeles County.[5] He is incorrect.

The Sixth Amendment guarantees the right to trial by a jury "of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." (U.S. Const., 6th Amend.; *People v. Delgado, supra,* 181 Cal.App.4th at p. 846.) However, our California Supreme Court has held that the Sixth Amendment's vicinage clause is not applicable in a state criminal trial. "Because the history of the Fourteenth Amendment does not indicate an intent to incorporate the vicinage clause of the Sixth Amendment and vicinage today is not a fundamental aspect of the right to jury trial necessary to ensure a fair trial, . . . the vicinage clause is not applicable in a state criminal trial." (*Price v. Superior Court, supra,* 25 Cal.4th at p. 1069; see also *Delgado*, at p. 846; *People v. Nguyen, supra,* 184 Cal.App.4th at p. 1109.) We, of course, are bound by *Price* (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; *Delgado*, at p. 846), and Sinohue's Sixth Amendment claim therefore fails.

Article I, section 16 of the California Constitution provides that trial by jury is an inviolate right, and has been construed as encompassing an implicit vicinage right. (*Price v. Superior Court, supra,* 25 Cal.4th at p. 1071.) In *Price,* our Supreme Court held that trial of offenses committed in different counties in a single proceeding pursuant to an

---

[5] Venue refers to the location where the trial is held; vicinage refers to the area from which the jury pool is drawn. (*Price v. Superior Court, supra,* 25 Cal.4th at p. 1054.)

12

earlier version of section 784.7 did not violate a defendant's state constitutional rights.[6] (*Price*, at p. 1050.) The court explained: "the right to a trial by a jury of the vicinage, as guaranteed by the California Constitution, is not violated by trial in a county having a reasonable relationship to the offense or to other crimes committed by the defendant against the same victim. . . . The Legislature's power to designate the place for trial of a criminal offense is limited by the requirement that there be a reasonable relationship or nexus between the place designated for trial and the commission of the offense. *Repeated abuse of the same child or spouse in more than one county creates that nexus.*" (*Id.* at p. 1075, italics added.) Thus, "Penal Code section 784.7 is constitutionally valid and does not violate petitioner's right to trial by a jury of the vicinage." (*Price*, at p. 1075.)

Here, the nexus between Los Angeles and San Mateo Counties was the one specifically identified as sufficient by *Price:* Sinohue repeatedly abused J.K. in both counties. He first molested J.K. when J.K.'s family was vacationing in Los Angeles; then, a few weeks after J.K. returned home, Sinohue followed and moved to a nearby community, taking on the role of J.K.'s frequent babysitter, where he continued sexually abusing the child. These circumstances clearly demonstrated the requisite reasonable relationship and nexus between the two venues. Accordingly, there was no violation of Sinohue's rights under the California Constitution.

2. *The trial court's refusal to dismiss prospective jurors for cause or allow Sinohue additional peremptory challenges was not reversible error.*

During voir dire, the trial court denied 20 of Sinohue's requests to strike prospective jurors for cause. Sinohue subsequently exercised peremptory challenges against 19 of these jurors. After exhausting his remaining peremptory challenges, he sought additional peremptory challenges, but the trial court denied his request. Sinohue

---

[6]    At the time *Price* was decided, section 784.7 required that the defendant and the victim be the same for all offenses in order for the crimes to be joined. (*People v. Nguyen, supra,* 184 Cal.App.4th at p. 1108.) In 2002 the Legislature amended section 784.7 to delete the same victim requirement. (*Nguyen*, at p. 1108.) Here, of course, J.K. was the victim in counts 3, 4, and 5.

contends the trial court's rulings were an abuse of discretion and a violation of his right to trial by jury, entitling him to reversal of his convictions. We disagree.

a. *Applicable legal principles.*

To help ensure a criminal defendant's constitutional right to trial by an unbiased, impartial jury (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16), a juror may be challenged for cause for implied bias or for actual bias. (Code Civ. Proc., § 227; *People v. Black* (Mar. 27, 2014, S206928) ___ Cal.4th ___ [2014 Cal. LEXIS 2103].) " ' "Actual bias" in this context is defined as "the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." [Citations.]' " (*People v. Ayala* (2000) 24 Cal.4th 243, 271-272; Code Civ. Proc., § 225, subd. (b)(1)(C); see also *People v. Barnwell* (2007) 41 Cal.4th 1038, 1051.)

It is well settled that " ' " [a]ssessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court. [Citation.] The trial court must determine whether the prospective juror will be 'unable to faithfully and impartially apply the law in the case.' [Citation.] A juror will often give conflicting or confusing answers regarding his or her impartiality or capacity to serve, and the trial court must weigh the juror's responses in deciding whether to remove the juror for cause. The trial court's resolution of these factual matters is binding on the appellate court if supported by substantial evidence. [Citation.]" ' " (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1285; *People v. Boyette* (2002) 29 Cal.4th 381, 416; *People v. Hillhouse* (2002) 27 Cal.4th 469, 488; *People v. Kaurish* (1990) 52 Cal.3d 648, 675.)

Deference to the trial court is appropriate " 'because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors.' [Citations.]" (*People v. Gonzales, supra,* 54 Cal.4th at p. 1285.) " '[A]ppellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on

14

the record.' " (*People v. Avila* (2006) 38 Cal.4th 491, 529; *People v. Stewart* (2004) 33 Cal.4th 425, 451; *People v. Fuiava* (2012) 53 Cal.4th 622, 656-657.) " '[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his [or her] opinion than his [or her] words. That is seen below, but cannot always be spread upon the record. Care should, therefore, be taken in the reviewing court not to reverse the ruling below upon such a question of fact, except in a clear case.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 428, fn. 9.)

Our Supreme Court has recently clarified the proper standard for determining whether a trial court's erroneous denial of a challenge for cause warrants reversal. In *People v. Black, supra,* __ Cal.4th __ [2014 Cal. Lexis. 2103], the court explained: "We conclude that [*People v. Yeoman* (2003) 31 Cal.4th 93] sets forth the correct standard for a defendant to demonstrate prejudice after properly preserving a claim that the defense used peremptory challenges to cure a trial court's erroneous denial of one or more for-cause challenges. A defendant must show that the error affected his right to a fair trial and impartial jury. When a defendant uses peremptory challenges to excuse prospective jurors who should have been removed for cause, a defendant's right to an impartial jury is affected only when he exhausts his peremptory challenges and an incompetent juror, meaning a juror who should have been removed for cause, sits on the jury that decides the case." *Black* rejected an alternate test articulated in dicta in *People v. Bittaker* (1989) 48 Cal.3d 1046. (*People v. Black, supra,* at p. __ [2014 Cal. LEXIS 2103].)

b. *Application here.*

Under the *Yeoman* test, Sinohue must identify an incompetent sitting juror who was challenged for cause. (*People v. Bonilla* (2007) 41 Cal.4th 313, 340. ) This he has failed to do. Sinohue argues that two sitting jurors, Nos. 3396 and 1160, should have been excused for cause and were biased against him, based on their statements during voir dire. Further, he argues that although Juror No. 1744's responses did not give rise to a challenge for cause, he would have exercised a peremptory challenge against her had he had any peremptory challenges left.

15

Because Juror No. 1744's responses did not give rise to a challenge for cause, Sinohue cannot show she was biased or lacked impartiality. Accordingly, he has not shown she was biased or incompetent.

The responses of the other two sitting jurors Sinohue identifies do not demonstrate incompetence either. Juror No. 3396's niece was "married to a child molester" who had victimized "the nieces and nephews." He was convicted and imprisoned. Juror No. 3396 repeatedly and unequivocally stated that she would be fair, and that nothing about the other case would affect her ability to be fair in the instant case. Juror No. 1160 had been sexually molested by her mother's ex-husband. She became teary-eyed and emotional when answering questions. She acknowledged that the trial would "probably" bring back memories and affect her ability to concentrate. However, she stated she would "be open to hear both sides and judge from that"; her verdict would depend on "the witnesses and everything, that I have to hear everything in order for me to be convinced"; and if she did not believe the witnesses, "it's not guilty"; and she would be fair and listen to all the evidence. She confirmed she would not hold a failure to testify against Sinohue. The trial court concluded the jurors would be fair.

The trial court's rulings in regard to Juror Nos. 3396 and 1160 were not an abuse of discretion. The record contains substantial evidence supporting its conclusions, and its ruling is therefore binding on this court. Sinohue's assumption that a prospective juror who has been a victim of sexual abuse must always be excused for cause lacks merit. (Cf. *People v. Lloyd* (1992) 4 Cal.App.4th 724, 735-735 [juror could be fair and impartial despite fact she had recently been a victim of auto theft, the charged crime].) Whether any particular juror could be fair and impartial despite their personal experiences with a similar crime was a question for the trial court, to be decided on a case-by-case basis. Accordingly, Sinohue has not demonstrated prejudice under the *Yeoman* test.

c. *Denial of request for additional peremptory challenges.*

Sinohue further argues that the trial court erred by denying his request for additional peremptory challenges, made after he exhausted his allotted 20 challenges, in light of the unusually large number of persons in the venire who had been victims of

16

sexual molestation. This contention lacks merit. Under state law, Sinohue was entitled to the 20 peremptory challenges he received. (Code Civ. Proc., § 231, subd. (a); *People v. Blair* (2005) 36 Cal.4th 686, 743-744, disapproved on another point in *People v. Black, supra,* __ Cal.4th at p. __.) "Defendant received and exercised the 20 peremptory challenges allotted to him under state law. [Citation.] State law required him to use those peremptories to cure any erroneous denials of challenges for cause. [Citation.] Defendant received all that was due him under state law." (*Blair*, at pp. 743-744.) To the extent he intends to raise a federal constitutional claim, his argument likewise fails. As explained in *People v. Clark* (2011) 52 Cal.4th 856: "Defendant . . . asserts that because the court's rulings compelled him to use his peremptory challenges to excuse jurors who should have been excused for cause, he was deprived of his federal constitutional right to a state-created liberty interest in 20 peremptory challenges. [Citation.] We have repeatedly rejected the identical argument. [Citations.] Defendant provides no persuasive basis for revisiting our prior pronouncements here." (*Id.* at p. 902.)

       3. *Contentions related to the "where it all began" letter.*

      Sinohue argues the "where it all began" letter found on his computer should have been excluded because it was irrelevant and highly prejudicial, and his attorney provided ineffective assistance by failing to call an expert witness to refute or ameliorate the letter's impact. We disagree.

       a. *The letter was properly admitted.*

       (i) *Additional facts.*

      As described *ante*, when Sinohue's computers were searched pursuant to a warrant investigators discovered a letter, akin to a diary entry, written by Sinohue and entitled "Where it All Began." The letter described Sinohue's strict religious upbringing, including prohibitions on dating or sexual activity outside marriage; the limits on social interactions and activities imposed by his religion during his childhood; his accidental discovery of a pornographic magazine and his frequent masturbation starting at the age of 11; and a sexual encounter that J.K. purportedly initiated with Sinohue when J.K. was 2 years old and Sinohue was 14. As to the latter incident, the letter related that in 1986

Sinohue accompanied Monique and her family on a trip to Yosemite. Monique told Sinohue that a neighbor child had touched J.K. in a questionable manner and J.K. was "now fixated on" penises. Consequently, during the trip, J.K. repeatedly asked to see Sinohue's penis, but Sinohue declined. While Sinohue was babysitting J.K., J.K. again asked to see Sinohue's penis. When Sinohue complied and pulled down his pants, J.K., out of curiosity, grabbed Sinohue's penis and put it in his mouth. Sinohue did not attempt to stop J.K. or pull away. The letter detailed Sinohue's high level of sexual arousal as a result of J.K.'s activity.

Sinohue moved in limine to exclude evidence of the letter on the ground its probative value was outweighed by its prejudicial effect. He contended the letter addressed conduct that occurred years before, when he was a minor, and was not illegal. The trial court denied the motion, holding the document's "relevance absolutely outweighs any potential for undue prejudice." The court found the letter was directly and "incredibly relevant" in that it demonstrated Sinohue's relationship with the victim and his "lust or feelings or . . . unusual attraction to" J.K.[7]

The letter was subsequently read into evidence at trial. J.K. testified that he had no memory of the incident and had never seen the letter. Sinohue testified that he wrote the letter in 2006 or 2007, but never sent it or showed it to anyone.

(ii) *Discussion.*

Sinohue contends admission of the letter was an abuse of discretion and violated his rights to due process and a fair trial. Only relevant evidence is admissible. (Evid. Code, § 350.) Evidence is relevant if it has a tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action. (Evid. Code, § 210; *People v. Lopez* (2013) 56 Cal.4th 1028, 1058; *People v. Mills* (2010) 48 Cal.4th

---

[7] Although the trial court and parties at various times discussed whether the letter was admissible under Evidence Code section 1108 as evidence of a prior sexual offense, ultimately the trial court and prosecutor concluded it was "not really 1108 evidence" but was relevant for "many other reasons than 1108." Defense counsel and the prosecutor agreed that an instruction regarding Evidence Code section 1108 should not be given.

158, 193.) Under Evidence Code section 352, a trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time. (*Lopez*, at p. 1058; *People v. Riggs* (2008) 44 Cal.4th 248, 290.) A trial court has broad discretion in determining whether evidence is relevant and whether Evidence Code section 352 precludes its admission. (*Lopez,* at pp. 1058-1059; *People v. Cowan* (2010) 50 Cal.4th 401, 482; *Mills*, at p. 195.) " 'The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. . . . "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " [Citation.]' [Citation.]" (*Lopez*, at p. 1059; *People v. Scott* (2011) 52 Cal.4th 452, 491.)

We apply the abuse of discretion standard to a trial court's rulings on the admissibility of evidence, including those turning on the relevance or probative value of the evidence in question. (*People v. Fuiava, supra,* 53 Cal.4th at pp. 667-668; *People v. Scott, supra,* 52 Cal.4th at p. 491; *People v. Hamilton* (2009) 45 Cal.4th 863, 930.) The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair. (*Hamilton*, at p. 930; *People v. Partida* (2005) 37 Cal.4th 428, 439.)

The trial court did not abuse its discretion by concluding the "where it all began" letter was highly probative. To prove a violation of section 288, subdivision (a), as alleged in counts 3 and 4, the People were required to prove Sinohue committed a lewd act upon J.K. "with the intent of arousing, appealing to, or gratifying" his or J.K.'s "lust, passions, or sexual desires." (§ 288, subd. (a).) Sinohue described in detail in the "where it all began" letter how he became highly sexually aroused by two-year-old J.K.'s actions. Among other things, Sinohue wrote that the sensation was "incredible," that his "brain was on fire with the stimulation," and he was the "most turned on in [his] history." These admissions by Sinohue were strong evidence that he was sexually excited by sexual

19

contact with young boys, and therefore tended to show he committed the charged conduct with the intent of arousing his sexual passions. Moreover, the jury could reasonably infer from the title Sinohue gave his letter—" 'Where It All Began' "—that Sinohue continued an abusive sexual relationship with J.K. sometime after the Yosemite incident.

Sinohue contends any reasonable juror would have been "sickened" and "disgusted" by his graphic description of the Yosemite incident and his resultant sexual arousal, and the evidence would "certainly cloud the objectivity of even the most dispassionate juror." However, prejudice, as contemplated by Evidence Code section 352, " ' "is not so sweeping as to include any evidence the opponent finds inconvenient." ' " (*People v. Scott, supra,* 52 Cal.4th at p. 490.) Evidence is not prejudicial under Evidence Code section 352 unless it evokes an emotional bias against the defendant *and* has very little effect on the issues. (*People v. Lopez, supra,* 56 Cal.4th at p. 1059.) As we have explained, the letter was highly probative. Moreover, it was not substantially more inflammatory than J.K.'s testimony at trial, which included details of Sinohue's continuing molestations including masturbation, oral copulation, and attempted anal penetration. (See *People v. Waples* (2000) 79 Cal.App.4th 1389, 1395.)[8]

b. *Sinohue has failed to establish ineffective assistance of counsel.*

Sinohue next contends that once the trial court ruled the "where it all began" letter was admissible, defense counsel should have presented the testimony of an expert witness on child sexuality to rebut or ameliorate the People's theory that the letter evidenced the intent element of the offenses. Citing a law review article, he avers that studies have shown childhood sexual play is common and is not evidence a child is predisposed to commit sex crimes or become a pedophile. (See Garfinkle, *Coming of Age in America: The Misapplication of Sex-Offender Registration and Community-Notification Laws to Juveniles* (2003) 91 Cal. L.Rev. 163, 185-186.) He urges that

---

[8] In light of our conclusion, we need not reach the People's arguments that Sinohue has waived any due process claim, and that any error in admission of the letter was harmless.

20

counsel's failure to present such expert testimony resulted in the abandonment of a viable defense.

"To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citation.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*People v. Scott* (1997) 15 Cal.4th 1188, 1211-1212; *Strickland v. Washington* (1984) 466 U.S. 668, 694; *People v. Homick* (2012) 55 Cal.4th 816, 893, fn. 44.) If the defendant makes an insufficient showing on either component, the claim fails. (*People v. Lopez* (2008) 42 Cal.4th 960, 966.) "If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.] Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211; *Lopez,* at p. 966; see *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) We presume counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. (*Carter*, at p. 1211; *People v. Jones* (2003) 29 Cal.4th 1229, 1254.)

Sinohue has not met this burden. He has not shown that defense counsel was asked for an explanation but failed to provide one. Whether to call particular witnesses is a matter of trial tactics (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1059) and nothing in the record before us suggests counsel's decision to forgo retaining an expert on childhood sexuality was unreasonable. Indeed, the record before us does not establish that favorable or exculpatory expert testimony regarding the "where it all began" letter was available. For all we know, counsel investigated the availability of expert testimony on the point and determined it was unfavorable or equivocal. Counsel may have made a

tactical choice to avoid calling an expert for fear the People would call a rebuttal expert, resulting in overemphasis on the letter or additional unfavorable testimony. We are not at liberty to "engage in the ' "perilous process" ' of second-guessing counsel's trial strategy." (*People v. Frye* (1998) 18 Cal.4th 894, 979, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Sinohue's ineffective assistance claim lacks merit.

      4. *Contentions related to the admission of CSAAS evidence.*

      a. *Additional facts.*

      Prior to trial Sinohue filed a motion in limine to exclude, inter alia, the testimony of "any . . . non-qualified expert witness, relative to any expert opinions that . . . there is the presence of a child abuse accommodation syndrome . . . ." At the hearing on the motion, defense counsel stated that he had just received from the prosecutor information "about an expert witness. I certainly, upon proper qualification for that witness, clearly would have no objection." Defense counsel indicated his objection was to police officer or civilian witnesses giving expert opinions.

      At trial Jayme Bernfeld, a clinical psychologist specializing in the treatment of sexually abused children, testified for the prosecution as an expert on CSAAS. The defense did not object.

      Her testimony was as follows. CSAAS is a model designed to help explain why sexually abused children often do not resist and delay reporting, or do not disclose, the abuse. CSAAS is not a diagnostic tool and is not meant to determine whether or not a child has been abused. CSAAS described five components: secrecy; helplessness; accommodation; delayed disclosure; and retraction. The first three components describe the dynamic within which child sexual abuse occurs, and are generally applicable to all child abuse victims; the fourth stage applies to a majority of victims. Close to 50 percent of molested children never disclose the abuse, and only 10 to 15 percent disclose within the first year after it occurs. Those who do disclose tend to do so in a piecemeal fashion, "testing the waters" to see if the recipient of the information is positive and supportive. The fifth component, retraction, is not common and is most likely to occur where the

child lacks family support and legal action is involved. Children do not often make things up, especially something that is embarrassing and might get them in trouble. It is common for the accommodation portion of the model to continue even after the abuse stops. If a child receives monetary gifts from the abuser, he or she is less likely to disclose the abuse. During cross-examination, Dr. Bernfeld acknowledged that a false allegation of molestation could "become increased" in the mind of a very young child if "everybody in their world was talking about it as if it were true." It was possible that an adult could make a false claim of molestation in hopes of financial gain. The particulars of the CSAAS model are as consistent with false testimony as with true testimony. Dr. Bernfeld did not "know anything about the facts" of the instant case.

In rebuttal, CSAAS expert Annette Ermshar, a clinical and forensic psychologist, testified for the defense. Dr. Ermshar, like Dr. Bernfeld, testified regarding the five stages in the CSAAS model. In her view, all five stages are present in all children, in that all children have kept secrets, felt powerless, accommodated adults, and so on. Children's memories are "very suggestible," so if parents or authority figures say or do something to show they do not like another person, a child will agree with the parent. Children fabricate and make up stories, and sometimes have a distorted memory of how events occurred, "not because they're lying" but because "memory is so malleable and it's so imprecise." If a child is asked about an event repeatedly, he or she may come to believe the event actually happened. Children sometimes accommodate by going along with the majority or the group. Children may retract a story because it was untrue, or because it was true and they are trying to protect another person. Approximately 40 percent of children report abuse within 48 hours, and most report within two years. A longer delay is unusual. A delay in reporting may be due to the fact there was no abuse, but "through various forms of suggestibility, stories get created or exacerbated, and then they're going to report some created or exacerbated story." If it is uncertain whether abuse occurred, CSAAS is not appropriate because it is only intended as a clinical tool to explain the behavior of children who have suffered known abuse. CSAAS has not been

23

generally accepted as a scientific principle in the scientific community. CSAAS is a useful tool in explaining the behavior of child sexual abuse victims.

b. *Admission of the CSAAS evidence.*

Sinohue contends his convictions must be reversed because Dr. Bernfeld's testimony regarding CSAAS was irrelevant and unduly prejudicial, and its admission rendered his trial fundamentally unfair, thereby violating his due process rights. We disagree.

(i) *Forfeiture.*

Preliminarily, we agree with the People that Sinohue has forfeited any challenge to Bernfeld's testimony because he did not object to it below. Although he moved to exclude expert testimony by police officer or civilian witnesses, he never objected to Dr. Bernfeld's testimony. To the contrary, he told the court he would not object to the People's CSAAS expert if properly qualified, and he never raised an objection to Dr. Bernfeld's qualifications. Indeed, Sinohue presented the testimony of his own CSAAS expert. Under these circumstances any challenge to Bernfeld's testimony has been forfeited. (Evid. Code, § 353, subd. (a); *People v. Lindberg* (2008) 45 Cal.4th 1, 48; *People v. Combs* (2004) 34 Cal.4th 821, 848; *People v. Valdez* (1997) 58 Cal.App.4th 494, 505.)

(ii) *Admission of Dr. Bernfeld's testimony was not an abuse of discretion and did not violate Sinohue's due process rights.*

In any event, Sinohue's claim fails on the merits. A trial court has broad discretion in deciding whether to admit or exclude expert testimony, and its decision will not be reversed on appeal unless a manifest abuse of discretion is shown. (*People v. McDowell* (2012) 54 Cal.4th 395, 426; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1299; *People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001.) Expert testimony is admissible on any subject sufficiently beyond common experience such that the opinion of an expert would assist the trier of fact. (Evid. Code, § 801, subd. (a); *People v. Brown* (2004) 33 Cal.4th 892, 905.)

It has long been held that expert testimony regarding CSAAS is admissible for limited purposes in child sexual abuse trials. "[E]xpert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*People v. McAlpin, supra,* 53 Cal.3d at pp. 1300-1301; *People v. Sandoval, supra,* 164 Cal.App.4th at p. 1001; *In re S.C.* (2006) 138 Cal.App.4th 396, 418; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744; *People v. Bowker* (1988) 203 Cal.App.3d 385, 393-394; see also *People v. Brown, supra,* 33 Cal.4th at p. 906.) " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. . . . The great majority of courts approve such expert rebuttal testimony.' [Citation.]" (*McAlpin*, at p. 1301.) Admission of CSAAS testimony does not, by itself, violate a defendant's due process rights. (*Patino,* at p. 1747.)

Sinohue complains that CSAAS is "nothing more than voodoo science" and points to several out-of-state cases that have criticized or disallowed testimony about it. His argument is contrary to controlling California authority. In *McAlpin,* our Supreme Court relied on earlier California appellate decisions allowing CSAAS testimony, and adopted their reasoning in finding expert testimony regarding parental reactions to disclosure of abuse admissible. (*People v. McAlpin, supra,* 53 Cal.3d at pp. 1300-1302.) Subsequently, in *Brown* the court upheld the use of expert testimony on battered women's syndrome, again relying on the rationale supporting the admissibility of CSAAS evidence. (*People v. Brown, supra,* 33 Cal.4th at pp. 905-908.) The court has stated that CSAAS testimony may be relevant and useful to the jury in child abuse cases. (*McAlpin,* at pp. 1300-1301; *Brown*, at p. 906.) We are bound by the court's reasoning in these cases. (*Auto Equity Sales, Inc. v. Superior Court, supra,* 57 Cal.2d at p. 455; see also, e.g., *People v. Perez* (2010) 182 Cal.App.4th 231, 245; *In re S.C., supra,* 138 Cal.App.4th at p. 418; *People v. Wells* (2004) 118 Cal.App.4th 179, 188.)

California courts have rejected Sinohue's arguments that CSAAS testimony improperly bolsters a victim's credibility. (See *People v. Housley* (1992) 6 Cal.App.4th 947, 954-956; *People v. Patino, supra,* 26 Cal.App.4th at p. 1746.) Contrary to his assertions, Bernfeld's testimony did not make it impossible for him to challenge the victims' credibility or exclude the possibility the abuse was fabricated. Bernfeld testified she knew nothing about the case. It would have been clear to jurors that she was explaining behavior common to sexual abuse victims, rather than offering an opinion on the credibility of the witnesses or what actually happened in this case. (See *People v. Housley, supra,* 6 Cal.App.4th at p. 954.) Her testimony was properly limited to discussion of the syndrome's characteristics.[9] Moreover, Bernfeld made clear that the CSAAS model is not a diagnostic tool, is not meant to determine whether or not a child has been abused, and is as consistent with false testimony as with true testimony. "The purpose of CSAAS testimony was not to neutralize inconsistencies in the victim's testimony . . . ." (*People v. Patino, supra,* 26 Cal.App.4th at p. 1746.) Instead, it was meant to "explain the state of mind of the complaining witness." (*Ibid.*) Moreover, the defense offered its own expert, Dr. Ermshar, who testified that children are suggestible and may make up stories. Defense counsel rigorously cross-examined the witnesses. The jury was not compelled to accept Dr. Bernfeld's testimony, or conclude that the delays in reporting in this case were due to CSAAS, rather than to fabrication. And, as we discuss *post,* the jury was properly instructed that the CSAAS evidence was not evidence Sinohue committed any of the charged crimes.

---

[9]     Sinohue urges that CSAAS evidence is problematic because it is nonspecific. He posits that because the expert knows nothing about the specific case, the evidence is "so generic" as to lack probative value. However, appellate courts have held that this feature of CSAAS evidence benefits the defendant by preventing the jury from inferring the expert's testimony suggested the victims in the case were credible, or the abuse actually occurred. (See, e.g., *People v. Housley, supra,* 6 Cal.App.4th at pp. 955-956.) Where the expert discusses "victims as a class," any danger of misuse of the testimony is "alleviated—if not removed." (*People v. Stark* (1989) 213 Cal.App.3d 107, 115-116.)

Sinohue raises two additional bases for exclusion of the evidence.  First, he posits that the CSAAS testimony was irrelevant and inadmissible here, because there was no evidence the jurors needed to be disabused of any misconceptions.  CSAAS testimony must be "targeted to a specific 'myth' or 'misconception' suggested by the evidence." (*People v. Bowker, supra,* 203 Cal.App.3d at pp. 393-394.)  "Where there is no danger of jury confusion, there is simply no need for the expert testimony."  (*Id*. at p. 394.) Sinohue argues that unlike in the 1980's, when the CSAAS model was developed, the general public no longer entertains misconceptions about the behavior of sexual abuse victims, due, for example, to the popularity of police procedural television programs and media reports.  Further, he points to prospective jurors' responses when questioned during voir dire as evidence jurors in his case did not believe delayed reporting was inconsistent with molestation.

Television fiction is not a substitute for expert testimony, and the jurors' cursory responses during voir dire do not demonstrate they necessarily had a full and accurate understanding of the issue.  As *McAlpin* observed, " 'the admissibility of expert opinion is a question of degree.  The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard.' " (*People v. McAlpin, supra,* 53 Cal.3d at p. 1299-1300.)  Instead, expert testimony is admissible whenever it would assist the jury.  (*Id.* at p. 1300.)  Expert testimony regarding CSAAS is "pertinent and admissible if an issue has been raised as to the victim's credibility." (*People v. Patino, supra,* 26 Cal.App.4th at p. 1745.)  "It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation." (*Id.* at pp. 1744-1745.)

The victims' credibility was the central issue at trial.  Sinohue denied committing the offenses.  Both victims delayed reporting the abuse for substantial periods of time. The defense attacked the testimony of both victims as incredible due in part to the delay in reporting, theorizing that the family's group hysteria caused them to misremember or lie.  In J.K.'s case, the defense also argued the report of abuse was fabricated for financial

gain. Indeed, as Sinohue points out, "Normally, inconsistent statements and a failure to disclose would be viewed as indications that J.K. and D.L. lacked credibility." The People were entitled to rehabilitate their witnesses' credibility. (See *People v. Patino, supra,* 26 Cal.App.4th at p. 1747; *People v. Housley, supra,* 6 Cal.App.4th at p. 956.)

Second, Sinohue contends the CSAAS evidence was inadmissible under the *Kelly/Frye* standard[10] applicable to the admission of scientific evidence. However, the *Kelly/Frye* rule does not apply to CSAAS evidence used for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to molestation. (*People v. Harlan* (1990) 222 Cal.App.3d 439, 449 [the "Kelly/Frye rule does not apply to this type of evidence"]; cf. *People v. Stoll* (1989) 49 Cal.3d 1136, 1157 [expert testimony regarding psychiatric diagnoses is admissible without reference to the *Kelly/Frye* rule].) While *Kelly/Frye* does preclude the admission of CSAAS evidence to prove that a child has been abused, it is admissible "to dispel common misconceptions the jury may hold as to how such children react to abuse." (*People v. Sanchez* (1989) 208 Cal.App.3d 721, 734-735; *People v. Wells, supra,* 118 Cal.App.4th at p. 179, 188.) Accordingly, the *Kelly/Frye* rule is inapplicable here. (*Wells,* at p. 188; *People v. Housley, supra,* 6 Cal.App.4th at p. 955.)

In sum, on this record we are satisfied the CSAAS testimony was properly admitted to dispel misconceptions regarding the behavior of victims.

c. *Instruction with CALCRIM No. 1193.*

As noted *ante,* expert testimony regarding CSAAS only may be used to disabuse the jury of commonly held misconceptions regarding the behavior of abuse victims, not to corroborate the victims' claims of abuse. (*People v. Housley, supra,* 6 Cal.App.4th at

---

**10**      *People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. United States* (1923) 293 F. 1013. Although *Frye* was superseded by statute (*Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579; *People v. Leahy* (1994) 8 Cal.4th 587, 591-592), the test is still commonly denominated as the *Kelly/Frye* rule. *Kelly/Frye* requires, among other things, that before an expert testifies regarding a new scientific technique, the proponent of the evidence must show that the technique is sufficiently established to have gained general acceptance in the particular field in which it belongs. (*People v. Stoll, supra,* 49 Cal.3d at p. 1155; *People v. Housley, supra,* 6 Cal.App.4th at p. 955, fn. 2.)

p. 957; *People v. Patino, supra,* 26 Cal.App.4th at p. 1744.) Accordingly, to protect against possible misuse of the evidence, when a CSAAS expert has testified the jury must be instructed that "(1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Housley,* at p. 959.)

Here, the jury was instructed with the standard version of CALCRIM No. 1193, as follows: "You have heard testimony from Jayme Bernfeld and Annette Ermshar regarding child sexual abuse accommodation syndrome. [¶] Jayne Bernfeld's and Annette Ermshar's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [J.K.]'s or D.L.'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."

Sinohue argues the standard version of CALCRIM No. 1193 is flawed because it allows jurors to use CSAAS evidence to determine the victims' credibility and erroneously states CSAAS evidence can be used to corroborate claims of abuse, thereby lessening the prosecution's burden of proof in violation of his due process rights. We disagree.[11]

---

[11]    The People argue Sinohue has forfeited this contention because he did not specifically object to CALCRIM No. 1193; to the contrary, he *requested* it as an alternative to other special instructions he requested. Sinohue argues that because he proposed two special instructions on the topic, which the trial court declined to give, and requested that the jury be instructed regarding the CSAAS testimony shortly after the close of Dr. Bernfeld's testimony, he effectively objected to the instruction. He alternatively contends that his counsel provided ineffective assistance by failing to object. Section 1259 permits appellate review of claims of instructional error affecting a defendant's substantial rights. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1074, fn. 7; *People v. Felix* (2008) 160 Cal.App.4th 849, 857-858.) In light of this section and Sinohue's claim of ineffective assistance of counsel, we consider the merits of his claim. (See *People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249 [to determine whether a

29

We independently determine whether the instructions given were correct and adequate. (*People v. Riley* (2010) 185 Cal.App.4th 754, 767; *People v. Mathson* (2012) 210 Cal.App.4th 1297, 1311.) When reviewing a purportedly ambiguous or misleading instruction, we inquire whether there is a reasonable likelihood the jury applied the challenged instruction in a way that violates the Constitution. (*People v. Richardson* (2008) 43 Cal.4th 959, 1028; *People v. Lopez* (2011) 198 Cal.App.4th 698, 708.) We "look to the instructions as a whole and the entire record of the trial, including the arguments of counsel," and assume that the jurors are intelligent persons, capable of understanding and correlating the instructions given. (*Lopez*, at p. 708; *Riley*, at p. 767.) Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation. (*Riley*, at p. 767; *Lopez*, at p. 708.)

CALCRIM No. 1193 clearly and appropriately informed jurors of the relevant legal principles. Contrary to Sinohue's argument, the instruction does not state, explicitly or implicitly, that the evidence could corroborate the victims' claims of abuse. To the contrary, it expressly stated that the testimony "*is not evidence that the defendant committed any of the crimes* charged against him." (Italics added.) The instruction was not objectionable because it allows the jurors to consider the CSAAS testimony in evaluating the witnesses' credibility; that is precisely the issue the evidence is offered to prove. Expert testimony regarding CSAAS "is admissible to rehabilitate the complaining witness when the defendant impeaches her *credibility*." (*People v. McAlpin, supra,* 53 Cal.3d at p. 1300, italics added.) Thus, CALCRIM No. 1193 is a correct statement of law. The instruction did not require jurors to accept the evidence, or interpose a presumption it was true. The mere availability of additional evidence to prove guilt does not lower the prosecution's burden of proof. (*People v. Falsetta* (1999) 21 Cal.4th 903, 920.)

---

defendant's substantial rights were affected, appellate court must examine the merits of the claim at least to the extent of ascertaining whether error was prejudicial].)

Moreover, the omission of additional language that was included in the predecessor to CALCRIM No. 1193, CALJIC No. 10.64, was immaterial. The jury was fully instructed on the presumption of innocence and the prosecutor's burden of proof. Unlike CALJIC No. 10.64, CALCRIM No. 1193 does not include discussion of the assumptions underlying CSAAS, but this does not make it inadequate. CALCRIM No. 1193 informed the jury of the proper uses of the evidence, the only essential information required.

5. *Purported governmental misconduct.*

a. *Additional facts.*

During trial, Detective Stewart testified that she asked D.L.'s family to put together a timeline of events to assist her in the investigation. She explained: "I asked D.L.'s family to do that because they were coming to me—after the report had been made, a lot of people, the different parties involved—with saying there was barbecues, and 'We saw this creepy thing happen, or this was a birthday party and something happened.' And it was getting very confusing for me to try and keep track of what incidences they were talking about. So I asked them, 'Please, get together, and every one of you that had the creepy feeling or saw something, please write it down in a timeline and give it to me.' " Detective Stewart received the timeline around January 10 or 11, 2010, after charges were filed.

Jodi testified that "after the first court date," the "detective suggested that we get together so we can put our thoughts down and some timeframes down." Accordingly, Jodi, Carl, Dave, B.T., Chris, Lori, and a friend named Becky met at Jodi and Carl's home and typed up a timeline of events. Other than that, while the case was pending Jodi did not discuss it with anyone except her husband, Carl.

Similarly, B.T. testified during cross-examination that sometime after the arraignment, the detective asked them "to create a timeline, basically, amongst all of us. . . . So we all got together and started discussing instances that we felt uncomfortable and just kind of got a timeline, months, days, each of us, and that was at Jodi's house." She explained: "Well, Carl had a notepad, and each of us . . . spoke, so I would go and

31

say, 'On this date, I noticed this. On this date, I noticed that.' I don't think it was comparing, but we were just putting the timeline. If I noticed something in September and then Jodi noticed something in August, then it would be placed on the paper accordingly so that we had an appropriate timeline for the detective."

    b. *Discussion*

    Sinohue contends Detective Stewart's request that D.L.'s family create the timeline amounted to witness tampering and "police and governmental misconduct," tainted the testimony of all persons who attended the timeline meeting, and thereby deprived him of his rights to effective cross examination and a "fair trial based on the true individual testimony" of the witnesses. We disagree.

    Preliminarily, Sinohue has forfeited his claims. His motion in limine sought exclusion of testimony that was not based on personal knowledge, not the grounds now stated. At the hearing on the motion, the court observed it was a "general motion" and directed counsel to make specific objections at trial. The court explained, "unless you have something specific in mind at this point, there's really not much I can do as far as making any orders." Sinohue did not, in the in limine motion or at trial, object to admission of the testimony on grounds of either police misconduct, "witness tampering," or prosecutorial misconduct. "Evidence Code section 353, subdivision (a) allows a judgment to be reversed because of erroneous admission of evidence only if an objection to the evidence or a motion to strike it was 'timely made and so stated as to make clear the specific ground of the objection.' " (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20-21.) As Justice Werdegar observed in her concurring opinion in *People v. Smith* (2003) 31 Cal.4th 1207, the "due process 'defense' of outrageous law enforcement conduct is actually a *bar to prosecution* rather than a defense to the charge; as such, it is properly raised by motion . . . ." (*Id.* at p. 1228.) Likewise, claims of prosecutorial misconduct are forfeited unless the defendant objects at trial. (*People v. Riggs, supra,* 44 Cal.4th at p. 298; *People v. McKinzie* (2012) 54 Cal.4th 1302, 1358.)

    Sinohue's contentions fail on the merits in any event. Although Sinohue characterizes Detective Stewart's request that those close to D.L. meet and prepare a

timeline as "egregious" behavior, "significant" and "undisputed" misconduct, and "coercive state action," he fails to present authority or point to evidence in the record establishing this point. "Outrageous government conduct is not a defense, but rather a claim that government conduct in securing an indictment was so shocking to due process values that the indictment must be dismissed." (*U.S. v. Montoya* (9th Cir. 1995) 45 F.3d 1286, 1300; *People v. Smith, supra,* 31 Cal.4th at p. 1228 (conc. opn. of Werdegar, J.).) Police conduct is outrageous enough to violate a defendant's due process rights only when it is " ' "so grossly shocking and so outrageous as to violate the universal sense of justice." ' [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 418, fn. 17; *U.S. v. Montoya, supra,* at p. 1300 ["Under the 'extremely high standard' of this doctrine, an indictment should be dismissed 'only when the government's conduct is so grossly shocking and so outrageous as to violate the universal sense of justice' "].)[12]

Detective Stewart's timeline request may or may not have been wise police procedure, but it was not misconduct as a matter of law, and certainly did not rise to the level of outrageous conduct. Her request does not shock the conscience. Contrary to Sinohue's argument, the detective did not "compel" the witnesses to meet; her conduct was not coercive. She did not suggest or require the witnesses to come to any particular conclusions, nor did she suggest they alter their observations to make them match.

Sinohue's alternative contention that the detective's action constituted "witness tampering" is equally unpersuasive. He analogizes to the federal witness tampering

---

[12]  *People v. Smith* declined to decide whether the "defense" of outrageous police misconduct is viable in California. (31 Cal.4th at p. 1227.) The court has previously observed, however, that "[s]ufficiently gross police misconduct could conceivably lead to a finding that conviction of the accused would violate his constitutional right to due process of the law." (*People v. McIntire* (1979) 23 Cal.3d 742, 748, fn. 1; see also *Morrow v. Superior Court* (1994) 30 Cal.App.4th 1252, 1260 [" 'When conduct on the part of authorities is so outrageous as to interfere with an accused's right of due process of law, proceedings against the accused are thereby rendered improper' "].)

statute, title 18 of the United States Code section 1512, but examination of the cited portions of that law demonstrates that the analogy is inapt. Under no stretch of the imagination can it be said that Stewart intimidated or threatened witnesses, attempted to influence their testimony or dissuade or prevent them from testifying, or obstructed or influenced an official proceeding. (18 U.S.C. § 1512(b), (c), (d).)

The contention that the prosecutor committed misconduct by knowingly presenting perjured testimony is also far off the mark. It is of course correct that a prosecutor's presentation of knowingly false testimony, or the failure to correct such testimony after it has been elicited, constitutes misconduct and violates the defendant's federal due process rights. (*People v. Vines* (2011) 51 Cal.4th 830, 873; *People v. Harrison* (2005) 35 Cal.4th 208, 242.) However, there is no evidence anything of the sort occurred here. There is no evidence, as opposed to rank speculation, that the timeline meeting influenced any witness's testimony, let alone resulted in perjured testimony. Sinohue's arguments are based entirely on his speculation that the meeting tainted the witnesses' "individual memories and observations." Speculation is an insufficient basis upon which to base a contention that a prosecutor knowingly offered perjured testimony. Moreover, "[m]ere inconsistencies between a witness's testimony and her prior statements do not prove the falsity of the testimony." (*Vines,* at p. 874.)

Sinohue's analogies to principles applicable to suggestive identification procedures and the exclusion of witnesses at trial pursuant to Evidence Code section 777[13] fail to establish his thesis that "due process demands that witnesses not discuss the facts or testimony." The timeline meeting at issue here is entirely unlike an identification procedure. A pretrial identification procedure is unfair if it suggests in advance the

---

[13] Evidence Code section 777 provides: "(a) Subject to subdivisions (b) and (c), the court may exclude from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of other witnesses. [¶] (b) A party to the action cannot be excluded under this section. [¶] (c) If a person other than a natural person is a party to the action, an officer or employee designated by its attorney is entitled to be present."

identity of the person the police suspect of the crime. (*People v. Brandon* (1995) 32 Cal.App.4th 1033, 1052.) Sinohue's identity was already well known to the witnesses and he had already been charged when the timeline meeting occurred. Contrary to the cases cited, Detective Stewart did not tell the witnesses their information was correct or present evidence in a fashion suggesting the result. In order to establish a due process violation in an identification procedure, unfairness must be proved as a " 'demonstrable reality,' not just speculation." (*People v. Contreras* (1993) 17 Cal.App.4th 813, 819.) This Sinohue has failed to do.

Evidence Code section 777 does not apply to the investigation or pretrial phases of a case. It is applicable to the exclusion of witnesses at trial, not beforehand. That section in no way suggests that the admission of the testimony of witnesses who have spoken about the case outside of court ipso facto violates due process. Such a rule would, among other things, be impracticable to enforce for a variety of reasons. In any event, Evidence Code section 777 expressly allows parties to an action and, in the case of non-natural parties, a designated officer or employee to remain in court during the testimony of witnesses, even if they will later testify. Therefore, by its very terms Evidence Code section 777 does not require the result Sinohue seeks.

Nor has Sinohue established that the timeline meeting violated his confrontation rights. His contention that the timeline meeting "in and of itself create[d] false testimony" is not supported by persuasive authority or common sense. There is no evidence the meeting tainted the testimony of any witness, created a "collective consciousness," "destroyed any possibility of having each witness provide testimony excusive to that witness," or made it impossible for witnesses to testify truthfully. Again, these contentions are highly speculative and unsupported by evidence in the record. None of the witnesses testified they changed their perceptions or recollections, or altered their testimony, due to events at the meeting. Sinohue had ample opportunity to rigorously cross examine the meeting attendees to establish that their comments "mutual[ly] reinforce[d]" their opinions, as he suggests. Indeed, to some extent the

timeline meeting played into Sinohue's theory of the case, which was that the family members engaged in group hysteria and fabricated the allegations.

In sum, Detective Stewart's request that D.L.'s family members meet to prepare a timeline of events was not police or prosecutorial misconduct, and did not violate Sinohue's due process or confrontation rights.[14]

6. *Purportedly erroneous admission of evidence.*

Sinohue complains that the trial court erroneously admitted several pieces of evidence. We discern no prejudicial error.

As noted, we review a trial court's admission of evidence for abuse of discretion. (*People v. Brown* (2003) 31 Cal.4th 518, 547; *People v. Avitia* (2005) 127 Cal.App.4th 185, 193.) The erroneous admission of evidence requires reversal only if it is reasonably probable that defendant would have obtained a more favorable result had the evidence been excluded. (Evid. Code, § 353, subd. (b); *People v. Earp* (1999) 20 Cal.4th 826, 878; *People v. Watson* (1956) 46 Cal.2d 818, 836.) " 'Ordinarily, even erroneous admission of evidence does not offend due process unless it is so prejudicial as to render the proceeding fundamentally unfair.' [Citations.]" (*People v. Covarrubias* (2011) 202 Cal.App.4th 1, 20.)

a. *Hearsay.*

Evidence of a statement made other than by a witness while testifying at trial, offered to prove the truth of the matter asserted, is hearsay and is inadmissible, unless there is an exception for its admission. (Evid. Code, § 1220.) Sinohue complains about five instances in which the trial court purportedly erred by admitting hearsay evidence.

(i) *Michael's testimony about J.K.'s statement.*

Over a defense objection, Michael testified that approximately two years before trial, J.K. told him Sinohue had sexually molested him when he was between nine and twelve years old. Sinohue contends the evidence was inadmissible hearsay, and its admission was reversible error. But as the People point out, Michael's testimony was

---

[14] In light of our conclusion, we find it unnecessary to reach the parties' arguments regarding prejudice.

36

admissible as a prior consistent statement. (Evid. Code, §§ 791, 1236.) Evidence Code section 791 provides an exception to the hearsay rule for evidence of a statement previously made by a witness that is consistent with his testimony at the hearing, if the statement is offered after "[a]n express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." (Evid. Code, § 791; *People v. Lopez, supra,* 56 Cal.4th at p. 1066; see also Evid. Code, § 1236.)

Michael's testimony fell within this hearsay exception. During cross-examination of J.K., which occurred before Michael testified, defense counsel attempted to show the charges against Sinohue were fabricated. In particular, he attempted to establish that J.K. had a financial motive to falsely accuse Sinohue of molesting him. Therefore, J.K.'s out-of-court statement qualified as a prior consistent statement and was admissible under Evidence Code sections 1236 and 791.[15]

(ii) *Evidence admitted pursuant to the state of mind exception.*

Sinohue also challenges the following testimony as violative of the hearsay rule: (1) Testimony by Jodi, Heather, and Barbara regarding Lisa's complaints about Sinohue's excessive attention to D.L. and Daniel; and (2) Heather's testimony that Michael told her J.K. had confided that Sinohue had molested him.

Evidence Code section 1250 provides a hearsay exception for evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation, including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health. "In order for this exception to apply, the statement must not have been made under circumstances indicating a 'lack of trustworthiness' ([Evid. Code,] § 1252), and must be offered either 'to prove the declarant's state of mind, emotion, or physical sensation,' or 'to prove or explain acts or conduct of the declarant.' (§ 1250, subd. (a).)

---

[15]    In light of our conclusion, we do not reach the People's alternative contention that the evidence was admissible under the state of mind exception to the hearsay rule.

A prerequisite to this exception is that the declarant's mental state or conduct be placed in issue." (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 884.)

The People argue that the aforementioned evidence was admissible under the state-of-mind exception. Sinohue argues that Lisa's state of mind was irrelevant, and therefore the exception was inapplicable. We need not resolve this question because, even if admitted in error, the challenged testimony was manifestly harmless under any standard. (*People v. Watson, supra,* 46 Cal.2d at p. 836; *Chapman v. California* (1967) 386 U.S. 18.) Michael testified that J.K. told him about Sinohue's abuse; Heather's testimony that Michael related that conversation to her added little, if anything, to the People's case. As to Lisa's complaints, there was ample evidence apart from the challenged testimony demonstrating that Sinohue spent an inordinate amount of time with D.L. and Daniel. Omission of the challenged evidence—which was but a small portion of the People's case—could not have resulted in prejudice. There is no likelihood Sinohue would have obtained a more favorable result had the evidence been excluded, and the evidence was not of an ilk to render his trial unfair. (Evid. Code, § 353, subd. (b); *People v. Earp*, *supra*, 20 Cal.4th at p. 878; *People v. Covarrubias, supra,* 202 Cal.App.4th at p. 20.)

7. *Lay opinion testimony.*

Sinohue next complains of five instances in which he asserts lay opinion testimony was erroneously admitted. As he acknowledges, defense counsel failed to object to any of the evidence he now challenges, and therefore his contentions have been forfeited. However, because he alternatively contends counsel was ineffective for failing to object, we consider the merits of his claim.

A non-expert witness may offer his or her opinion if it is "[r]ationally based on the perception of the witness" and "[h]elpful to a clear understanding of his testimony." (Evid. Code, § 800, subds. (a), (b); *People v. Bradley* (2012) 208 Cal.App.4th 64, 83.) A lay witness may not give an opinion about another's state of mind, but may testify about objective behavior and describe behavior as being consistent with a state of mind. (*People v. Blacksher* (2011) 52 Cal.4th 769, 808-809.) "A lay witness is occasionally

38

permitted to express an ultimate opinion based on his perception, but only where 'helpful to a clear understanding of his testimony' [citation], i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed." (*People v. Melton* (1988) 44 Cal.3d 713, 744.) The decision whether to permit lay opinion rests in the sound discretion of the trial court. (*Bradley*, at p. 83.)

a. *Barbara's and Jodi's testimony that Sinohue and D.L. embraced as though they were lovers.*

Jodi testified that after Sinohue gave D.L. a large flat screen television for his birthday, she saw D.L. give Sinohue "a big hug and [a] kiss, and they embraced as though they were lovers." She clarified, "I've only seen that type of embrace with a husband and wife or girlfriend and boyfriend . . . ." Barbara, when asked whether she noticed a difference in the way Sinohue interacted with Daniel and D.L., answered: "Daniel was more like an afterthought, and D.L., he catered to like a lover." She then recounted an incident in which Sinohue clipped D.L.'s fingernails and toenails. Admission of these statements was not improper. They were statements about Sinohue's behavior and were based on the witnesses' observations of Sinohue's behavior. (See *People v. Blacksher, supra,* 52 Cal.4th at pp. 808-809.) The description of the interaction between Sinohue and D.L. as similar to those of lovers was helpful to a clear understanding of the testimony, as the witnesses' meaning would have been difficult to convey otherwise. (See *People v. Melton, supra,* 44 Cal.3d at p. 744; *People v. Williams* (1992) 3 Cal.App.4th 1326, 1332 [lay opinion testimony is admissible where " 'as "a matter of practical necessity when the matters . . . observed are too complex or too subtle to enable [the witness] accurately to convey them to court or jury in any other manner" ' "]; cf. *People v. Farnam* (2002) 28 Cal.4th 107, 153 [correctional officer allowed to testify defendant was being defiant and stood in a posture as if he was going to begin fighting]; *People v. Medina* (1990) 51 Cal.3d 870, 886-887 [testimony regarding whether a person understood a conversation proper].)

b. *Heather's testimony regarding lotion.*

Heather testified that during the Cape Cod trip, a group of adults were watching television. Sinohue asked D.L. to rub lotion on his back. Two men who were in the group "had to get up and leave because it was so bothersome." Admission of this testimony was not improper. It was based on Heather's observations of Sinohue's and D.L.'s behavior. Sinohue contends her testimony was speculative. However, Heather could reasonably have determined the reason for the men's action based on their expressions and demeanor, as well as the timing of their departure. (See *People v. Hinton* (2006) 37 Cal.4th 839, 889 [lay opinion testimony proper where it was possible the witness's impression "rested on subtle or complex interactions" that were "difficult to put into words"].) There was no error.

c. *Other testimony.*

Sinohue also complains that: (1) Lori testified Sinohue sent D.L. a headset so he and D.L. could surreptitiously communicate; and (2) Heather testified that Lisa and Sinohue had not married because Sinohue was preoccupied with the children. Assuming arguendo these brief statements were admitted in error, there was no prejudice under any standard. (*People v. Bradley, supra,* 208 Cal.App.4th at p. 84; *People v. Watson, supra,* 46 Cal.2d at p. 836; *Chapman v. California, supra,* 386 U.S. 18.) The observations underlying the opinion were clearly admissible, and the challenged testimony was but a small bit of the People's case. The People's evidence was overwhelming, and it is clear beyond a reasonable doubt that the outcome would not have been more favorable for Sinohue had the challenged statements been excluded.

8. *Sentencing under the One Strike law.*

Sinohue was sentenced on all counts pursuant to the "One Strike Law," section 667.61. That statute requires that if a defendant is convicted of two sexual crimes against separate victims in one trial, the court must sentence him to 15 years to life on each conviction. (*People v. Nguyen, supra,* 184 Cal.App.4th 1096, 1107, fn. 5.) Sinohue committed the conduct that was the basis for count 5 between 1998 and 1999. However, the offense of continuous sexual abuse of a child—the offense charged in count 5—was

40

not added to the list of offenses subject to the One Strike Law until enactment of an amendment that took effect on September 20, 2006. (Stats. 2006, ch. 337, § 33.) Prior to that time, the crime was punishable by 6, 12, or 16 years in prison. (See § 288.5, subd. (a).)

Sinohue contends sentencing him under the One Strike Law on count 5 therefore violated ex post facto principles. The People concede the point, and we accept the concession. Both the California and federal Constitutions prohibit ex post facto laws. (U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. I, § 9.) " '[T]he ex post facto clauses of the state and federal Constitutions are "aimed at laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.' " ' " (*People v. Alford* (2007) 42 Cal.4th 749, 755; *Collins v. Youngblood* (1990) 497 U.S. 37, 43.) The amendment to section 667.61 did just that. (See generally *People v. Alvarez* (2002) 100 Cal.App.4th 1170, 1173, 1178.) Accordingly, we vacate sentence on count 5 and order the matter remanded for resentencing.

## DISPOSITION

Sentence on count 5 is vacated, and the matter is remanded for resentencing. In all other respects, the judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

ALDRICH, J.

We concur:

KLEIN, P. J.

CROSKEY, J.